No. 02-320

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 170

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

TONY RAY NOTTI,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and for the County of Jefferson, Cause No. DC-01-1755,
The Honorable Loren Tucker, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            J. Mayo Ashley, Attorney at Law, Helena, Montana

        For Respondent:

            Hon. Mike McGrath, Attorney General; Cregg W. Coughlin,
Assistant Attorney General, Helena, Montana

            Valerie D. Wilson, Jefferson County Attorney, Boulder, Montana

Submitted on Briefs:  January 23, 2003

Decided:  June 19, 2003

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 The State charged Defendant Tony Notti with one count of deliberate homicide. Notti moved to dismiss the charge, alleging that the State had violated his right to privacy. The District Court denied Notti's motion to dismiss. Notti pled guilty to deliberate homicide, and appeals the District Court's denial of his motion to dismiss. We affirm the District Court.

¶2 The issue on appeal is whether the State violated Notti's right to privacy when it used a DNA profile obtained as a result of another unrelated criminal investigation as evidence against him in this proceeding.

## BACKGROUND

¶3 On May 17, 2000, Mike Notti, the Defendant's brother, reported to the Missoula Police Department that the Defendant had sexually assaulted him on the prior evening and had stolen his .25 caliber handgun. Police investigated Mike Notti's complaint and collected physical evidence from his home, including samples believed to contain DNA evidence. Police submitted the physical evidence from the crime scene to the Montana Crime Lab to detect DNA evidence and to determine whether the victim was the source of the DNA evidence. It is unclear whether the Crime Lab initially performed the requested tests, but the Crime Lab did store the physical evidence from the sexual assault crime scene for later evaluation.

¶4 On May 20, 2000, Jefferson County police officers responded to a homicide report near a rest area along Interstate 90 near Butte, Montana, where they discovered the body of Robert Slawek. Near Slawek's body, police discovered and collected six shell casings from

a .25 caliber firearm, a hand-rolled cigarette butt, and a piece of cardboard from a .25 caliber ammunition box. Police performed an autopsy on Slawek's body and confirmed that he had died as a result of gunshot wounds and identified eight wounds from a .25 caliber firearm. Police then sent the cigarette butt from the crime scene to the Montana Crime Lab for detection of DNA evidence and to determine whether the victim was the source of the DNA evidence. On August 24, 2000, the Crime Lab examined DNA obtained from the cigarette butt and blood drawn from Slawek, and confirmed that Slawek was not the source of the DNA. The Crime Lab then placed the "DNA profile" obtained from the cigarette butt into the State's "forensic unknown" DNA database kept at the Crime Lab, and submitted the DNA profile from the cigarette butt to a manager of the Combined DNA Identification System (CODIS), a federal database which stores nationwide DNA profiles from certain convicted felons and unsolved crime scenes.

¶5     Meanwhile, in July 2000, Notti was arrested in Missoula County, Montana, pursuant to the sexual assault investigation. On September 8, 2000, Missoula Police Detective Rich Oschner spoke with Notti and Notti's attorney and requested that Notti consent to a blood draw that would be used to compare his DNA profile to the physical evidence stored at the Crime Lab. Notti discussed the matter with his attorney, and both agreed to permit Oschner to take a blood sample, which was done. The Montana Crime Lab analyzed Notti's blood sample, and in a report dated November 17, 2000, confirmed that Tony Notti's DNA profile matched the DNA profile of evidence obtained from the sexual assault crime scene, and Notti was later convicted of sexual intercourse without consent on February 7, 2001. In addition,

the Crime Lab placed Notti's DNA profile into its "suspect" DNA database, a database kept at the Crime Lab.

¶6     In April 2001, a student intern at the Crime Lab was assigned to compare profiles stored in the Crime Lab's "suspect" database and "forensic unknown" database when the intern discovered a match between Notti's DNA profile in the "suspect" database and the DNA profile from the cigarette butt placed in the "forensic unknown" database.  The Crime Lab confirmed that the initial match was not an error, and informed the Jefferson County Sheriff's Office and the Missoula Police Department of the profile match.  Police further investigated Notti's background and learned that Notti had been arrested on May 30, 2000, in Dane County, Wisconsin, for carrying a concealed .25 caliber handgun.  Police in Dane County, Wisconsin, performed ballistics tests on the handgun at the Milwaukee Crime Lab, and on April 26, 2001, after additional analysis, it was confirmed that the handgun confiscated in Wisconsin matched the weapon that had fired the six shell casings discovered near Slawek's body.

¶7     Police interviewed Notti on May 2, 2001, regarding the homicide case, while Notti was in prison awaiting a sentence for the sexual assault case.  At the interview, after being read a warning regarding his right against self-incrimination, Notti admitted that he had shot Slawek numerous times near a rest area on Interstate 90.

¶8     The State charged Notti with deliberate homicide on May 9, 2001.  On December 28, 2001, the State requested that Notti produce another biological sample for DNA analysis, which the District Court granted.  The Crime Lab confirmed that Notti's DNA profile from

4

the second sample matched the DNA profile of the DNA evidence recovered from the cigarette butt found near Slawek's body.

¶9    On January 16, 2002, Notti moved to dismiss the homicide charge, alleging that the State had illegally placed Notti's DNA profile on the State's "DNA Identification Index," as established by § 44-6-102, MCA, and that all of the "fruits" from that illegal placement should be suppressed.  After the parties briefed the issue, the District Court held a hearing on the issue on March 13, 2002, and orally denied Notti's motion after argument.  Notti changed his plea to guilty, and was sentenced to 80 years in prison on April 3, 2002.  Notti appeals the District Court's denial of his motion to dismiss.

STANDARD OF REVIEW

¶10   We review a district court's decision regarding a motion to suppress to determine whether its findings of fact are clearly erroneous.  *State v. Reesman*, 2000 MT 243, ¶ 18, 301 Mont. 408, ¶ 18, 10 P.3d 83, ¶ 18.  We review a district court's conclusions of law for correctness.  *Reesman*, ¶ 18.

DISCUSSION

¶11   Did the State violate Notti's right to privacy when it used a DNA profile obtained as a result of another unrelated criminal investigation as evidence against him in this proceeding?

¶12   The District Court denied Notti's motion to dismiss, finding that Notti had, with advice of counsel, consented to the initial withdrawal of blood for DNA analysis.  The District Court concluded that with Notti's valid consent, there was no unlawful invasion of

5

his privacy or any unreasonable search or seizure. In addition, the District Court concluded that pursuant to the "inevitable discovery" doctrine, that after Notti's conviction in the sexual assault case, the State would have been able to make the DNA match anyway. For that reason as well, the District Court denied Notti's motion to dismiss.

¶13 Notti contends that the District Court erred when it denied his motion to dismiss because he argues that the State had illegally placed his blood sample onto the State's DNA Identification Index. Notti posits that the statute that establishes the State's DNA Identification Index, § 44-6-102, MCA, provides only for the inclusion of DNA samples from convicted felons and crime scenes, and that the State should not have placed his DNA profile in the DNA Identification Index because he had not been convicted of any felony at the time the Crime Lab discovered the DNA profile match. Notti argues that the improper placement of his DNA profile led to all of the subsequently discovered evidence that the State seeks to use against him in the homicide trial, and that all of that evidence should have been suppressed by the District Court.

¶14 The State contends that Notti is mistaken in his claim that the State placed Notti's DNA profile in the State's DNA Identification Index, and points out that the Crime Lab only compared his DNA profile that was placed in the "suspect" database with the DNA profiles stored in the Crime Lab's "forensic unknown" database. The State also argues that Notti's blood sample and DNA profile were obtained after the consultation and consent of both Notti and his attorney, and that Notti waived any expectation of privacy in his blood sample or DNA profile. Last, the State reasserts that, under the doctrine of "inevitable discovery," that

6

the State would have discovered the profile match after Notti was sentenced for the felony rape conviction in March 2002 since the State DNA Identification Index requires that the State submit the DNA profiles of convicted felons, and that Notti's DNA profile would have matched the DNA profile from the cigarette butt stored in the same database. Therefore, the State argues that the District Court was correct in denying Notti's motion to dismiss since the "inevitable discovery" doctrine is a recognized exception to the general rule that district courts must exclude the "fruits" of an illegal search or seizure. *See State v. New* (1996), 276 Mont. 529, 536, 917 P.2d 919, 923.

¶15     It is well understood that Article II, Section 10, of the Montana Constitution protects a person's right to privacy, and neither party disputes that a withdrawal of a blood sample would fit within the types of governmental intrusions that our state constitution protects against. Therefore, we must determine whether the State's intrusion was unlawful. Previously, we held that when we consider whether a government's intrusion is unlawful, that we will consider: "(1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the state's intrusion." *State v. Therriault*, 2000 MT 286, ¶ 33, 302 Mont. 189, ¶ 33, 14 P.3d 444, ¶ 33. However, where a defendant has voluntarily consented to a particular search, we have held that the defendant's consent constitutes a waiver of any reasonable expectation of privacy with respect to the place searched, and that the permitted search is lawful. *State v. Rodgers* (1992), 257 Mont. 413, 419-20, 849 P.2d 1029, 1032.

¶16    In this case, the State provided a copy of Notti's signed written consent, dated September 8, 2000, which authorized the initial blood draw that was used by the Crime Lab to create a DNA profile for the initial sexual assault investigation. Notti has not claimed that his consent was invalid or involuntary, nor has he claimed that the initial blood draw violated his right to privacy with respect to the sexual assault case. Rather, Notti implies that the police and Crime Lab exceeded the scope of his consent and acted illegally when the State allegedly placed his DNA profile in the DNA Identification Index and compared it to DNA profiles from evidence recovered at other crime scenes. Notti contends that the District Court should have suppressed the results of the allegedly illegal use of his DNA profile and all of the evidence obtained as "fruits" of that initial illegal act.

¶17    This case presents the question of whether Notti retained a privacy interest in his blood sample or the DNA profile produced by the Crime Lab after initially analyzing Notti's blood sample. We have not previously addressed this issue, however, other jurisdictions that have considered the issue have agreed that a defendant's privacy interest in blood samples or blood profiles is lost when the defendant consents to a blood draw or where it has been obtained through proper judicial proceedings. *See People v. Baylor* (Cal. 2002), 118 Cal.Rptr.2d 518, 521; *Wilson v. State* (Md. 2000), 752 A.2d 1250, 1272; *Bickley v. State* (Ga. 1997), 489 S.E.2d 167, 170; *State v. King* (N.Y. 1997), 232 A.D.2d 111, 117-18; *Washington v. State* (Fla. 1994), 653 So.2d 362, 364.

¶18    Two cases from other jurisdictions contain analagous circumstances and persuasive discussion on this issue. In *King*, a blood sample was taken from the defendant pursuant to

a court order in a criminal proceeding, and that blood sample was later used as evidence against him in a subsequent unrelated criminal proceeding. The Appellate Division of the Supreme Court of New York upheld the use of the DNA profile in the subsequent case, stating:

> [O]nce a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person. In this regard we note that the defendant could not plausibly assert any expectation of privacy with respect to the scientific analysis of a lawfully seized item of tangible property, such as a gun or a controlled substance. Although human blood, with its unique genetic properties, may initially be qualitatively different from such evidence, once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests.

*King*, 232 A.D.2d at 117-18. In another case, the Indiana Supreme Court upheld the practice of comparing a suspect's court-ordered blood sample and DNA profile with other DNA profiles from unsolved crimes. *Smith v. State* (Ind. 2001), 744 N.E.2d 437. The Indiana Supreme Court held that keeping and using DNA profiles was not an unlawful invasion of the defendant's privacy, and stated:

> [The defendant] had a legitimate expectation of privacy in his body and blood samples at the time they were taken in the investigation of Case 1. . . . We agree that this includes the DNA residing in the cells of these samples. However, he does not challenge the original court order that authorized the seizure of these items. There has been no seizure or invasion of [the defendant's] privacy since the initial samples taken in Case 1. His claim thus reduces to the contention that the information must be destroyed after the investigation that analyzed it is concluded, or at least cannot be used in a subsequent investigation. We agree with several courts that have held that, once DNA is used to create a profile, the profile becomes the property of the

9

Crime Lab. Thus, [the Defendant] had no possessory or ownership interest in it.

*Smith*, 744 N.E.2d at 439 (citation omitted).

¶19 Although the circumstances in *King* and *Smith* are somewhat distinguishable to the extent that the blood samples and DNA profiles in those cases were obtained by court order rather than consent, we agree with the rationale provided by the New York and Indiana courts regarding the defendant's expectation of privacy in the future use of DNA profiles by legal authorities. We conclude that Notti waived any reasonable expectation of privacy in the DNA profile created by the Crime Lab. After the initial withdrawal of blood, obtained pursuant to the initial sexual assault investigation, there was simply no subsequent search or seizure of Notti's person such that Notti could invoke a privacy interest or right. Nor was there additional use or analysis of the blood specimen Notti had originally provided to State authorities. Rather, the State compared the numerical values that constitute Notti's DNA profile with other DNA profiles in the State's "forensic unknown" database when they discovered a DNA profile match between Notti's DNA profile and the DNA profile obtained from the cigarette butt found near Slawek's body. Notti has cited no authority to suggest that he retains a privacy interest in the work product of the Crime Lab, nor are we willing to create one as we have previously held that we will not consider legal arguments unsupported by authority. *State ex rel. Booth v. Montana*, 1998 MT 344, ¶ 35, 292 Mont. 371, ¶ 35, 972 P.2d 325, ¶ 35.

¶20 We also decline to consider Notti's claim that his DNA profile was illegally stored in the State's DNA Identification Index, as provided by §§ 44-6-101 to -110, MCA, as we find

10

no evidence in the record to support Notti's contention that this actually occurred. Notti has not cited to any evidence in the record to support a finding that the State had placed Notti's DNA profile in the DNA Identification Index. Rather, the testimonial and documentary evidence suggests that, instead, the Crime Lab maintained a "suspect database" separate from the DNA Identification Index, and that comparisons of DNA profiles in the "suspect database" and the "forensic unknown database" led to the DNA profile match. Notti does not argue or provide any authority to suggest that the State may not maintain a separate "suspect database" for DNA profiles of suspects in ongoing investigations. In any event, even if the storage of these DNA profiles does raise issues with respect to a defendant's right to privacy, we conclude that the District Court was nevertheless correct when it denied Notti's motion to dismiss because of the "inevitable discovery" doctrine. In *State v. Pearson* (1985), 217 Mont. 363, 704 P.2d 1056, we held that evidence initially obtained illegally by the State may nevertheless be used against a defendant in a criminal proceeding where it can be shown that the evidence would have been inevitably discovered despite a constitutional violation. In this case, it is recognized that Notti was convicted of sexually assaulting his brother after trial in February 2001, and was sentenced in March 2002. Section 44-6-102(2), MCA, provides that: "[t]he DNA identification index must include: (a) DNA records for an individual convicted of a felony offense . . . ." Thus, Notti's DNA profile would have been placed on the State's DNA Identification Index and submitted to CODIS, which would have inevitably led to the discovery of a match by either a CODIS computer check or when another Crime Lab employee compared profiles in the "forensic unknown" database with the

11

State's DNA Identification Index.  Therefore, we conclude that the District Court did not err when it denied Notti's motion to dismiss on the basis of the allegation that the State had improperly placed Notti's DNA profile in the State's DNA Identification Index.

¶21    For the foregoing reasons, the decision of the District Court is affirmed.


/S/ JIM REGNIER


We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE