HARRELL, J.,
which ADKINS, J., joins.
This case illustrates a corollary of the aphorism that “no good deed goes unpunished,” “be not so quick to volunteer.” After the report of an alleged rape, George Varriale (at worst, a person of interest at the time) consented to a police request that he supply biological samples from his person in order for police to determine whether he could be inculpated or exculpated as a suspect in the rape through comparison of his DNA profile with that of DNA left behind under the fingernails of the alleged victim apparently by the alleged unknown rapist.[1] *426 Based on the results of an Anne Arundel County crime laboratory comparison test performed on the samples provided by Varriale and those recovered from the alleged victim, Varriale was excluded quickly as a source of the DNA recovered from the victim. Despite this result, the Anne Arundel County Police Department Crime Laboratory forensic DNA analyst who performed the test uploaded (on her initiative) Varriale’s profile into the general suspect index of the County DNA databank in a fishing expedition to see if Varriale’s DNA profile matched any cold case DNA profile on record. That search yielded a match of Varriale’s DNA to a DNA profile obtained from an unsolved commercial burglary scene. The burglary occurred four years earlier.
The Majority determines today, among other things, that Varriale is to be faulted for not placing any “express limitation^)” on his consent when he acquiesced to the collection of buccal and penile swabs from his body for use in the rape investigation. The Majority holds that, absent “an express limitation on his consent,” “the Fourth Amendment did not prohibit the police from using Varriale’s lawfully obtained DNA sample ... for comparison to other DNA profiles that were unrelated to the rape investigation.” Maj. Op. at 410, 119 A.3d at 830. The Majority’s interpretation of Varriale’s consent is incorrect as a matter of law. It follows that the Majority’s Fourth Amendment analysis is flawed as well. Accordingly, I dissent.
I. Consent, Or The Lack Thereof
As the Majority opinion sets out in full, George Varriale’s consent to have biological samples taken from his person occurred during the late morning of 10 July 2012 in a wooded area in Glen Burnie, Maryland. Maj. Op. at 404-06, 119 A.3d at 826-28. Detective David Wood (“Detective Wood”), who was investigating a report of a rape occurring nearby, ap *427 proached Varriale, a homeless person who was living in a makeshift campground in a wooded area near the scene of the alleged crime, and introduced himself. Detective Wood explained that “he was conducting an investigation,”[2] Maj. Op. *428 at 405, 119 A.3d at 827, and asked Varriale if he would consent to a search of his person. Detective Wood read then to Varriale a document entitled “Anne Arundel County Police Consent to Search Person Form” (“Consent Form”) and placed a completed Consent Form in front of him for his signature. In pertinent part,[3] the Consent Form stated:
Case # : 12-725920[4]
Date: 7-10-12
I, George Varriale, do hereby consent to a search of my person for the purpose of furnishing evidence relating to one or more of the following:
[¶]... Saliva ... Penile Swabs ... ]
I realize that if I do consent to a body search, that any evidence found to be involved in this investigation, being *429 conducted by the Anne Arundel County Police Department can be used in any future criminal prosecution.
(emphasis added). Varriale signed the form, cooperated in the obtention of the samples by an evidence technician, and had an extended conversation with Detective Wood about the events of the proceeding evening. In short order, Varriale was excluded as a source of DNA from the alleged rape, see Maj. Op. at 406-09, 119 A.3d at 827-29, and Detective Wood did not contact Varriale again after 10 July 2012.[5]
At the suppression hearing, Varriale argued that the State’s DNA match evidence as to the much older burglary case should have been excluded on the grounds that subsequent use of his DNA profile to conduct a cold case comparison search of the DNA databank exceeded the scope of his consent and constituted therefore an unreasonable search in violation of his Fourth Amendment rights. See Maj. Op. at 406-09,119 A.3d at 827-29. The Circuit Court judge denied Varriale’s motion to suppress, sans explanation, findings of fact, or conclusions of law (not that such are required, but it is helpful often to understand what a trial judge is thinking, particularly in the context of a suppression ruling).
On appeal of Varriale’s conviction after entering a conditional guilty plea, the Court of Special Appeals conceded that Varriale “may not have unambiguously consented to the use of his DNA outside of the rape investigation,” Varriale v. State, 218 Md.App. 47, 52-53, 96 A.3d 793, 796 (2014), and that “the consent form is not a model of clarity.” Varriale, 218 Md.App. at 54, 96 A.3d at 797. The intermediate appellate court opined as follows:
While the form states that Varriale’s DNA “can be used in any future prosecution,” the form does not clearly specify whether the State may use the DNA only in a “criminal prosecution” for the alleged rape that the police were *430 actually investigating, as opposed to some other “criminal prosecution” that is entirely unrelated to the alleged rape. Because we must construe this ambiguity against the State as the drafter, we conclude that the consent form does not contain Varriale’s consent to the use of his DNA in criminal prosecutions that are unrelated to the alleged rape.
Id. The intermediate appellate court concluded nonetheless that the ambiguity was “ultimately immaterial” because the State did not run afoul of the Fourth Amendment as it “had no obligation to obtain a warrant before reexamining the DNA sample that it had lawfully obtained.” Varriale, 218 Md.App. at 53, 96 A.3d at 796; see id. at 55, 96 A.3d at 797.
The thrust of the Majority’s reasoning here hangs on its threshold determination that Varriale did not place an “express limitation” on his consent. See Maj. Op. at 404, 119 A.3d at 826 (“[W]e shall hold that, where Varriale’s consent to search was not expressly limited by him, by the State, or by law, the Fourth Amendment does not preclude the State from storing and using his voluntarily provided DNA sample and resultant DNA profile for additional, unrelated criminal investigations.”), 410-11, 415-16, 417-18, 418 n. 9, 418-19, 119 A.3d at 830, 833, 834-35, 835 n. 9, 835 (“Therefore, absent an express limitation placed on the use or storage of the DNA evidence by Varriale, the State, or by law, we cannot conclude that it was unreasonable for the State to maintain and utilize Varriale’s DNA for subsequent unrelated investigations.”), 418-19, 422-23, 423-24, 119 A.3d at 835, 837-38, 838. In interpreting the Consent Form signed by Varriale, the Court majority reasons that it
demonstrates neither an express limitation on the permitted use of the DNA evidence nor an express consent to any future use. Indeed, the form does not specify what the State would do with the DNA evidence once it was collected (namely, that it would retain the DNA profile and upload it to the LDIS). Unlike the Court of Special Appeals, however, we do not conclude that the form should be construed against the State to mean that there was no consent to the subsequent use and analysis of Varriale’s DNA.
*431 Maj. Op. at 415, 119 A.3d at 833. The Majority proceeds then to apply the United States Supreme Court’s “ ‘objective’ reasonableness” test, as set out in Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), to measure the scope of Varriale’s consent: “[WJhat would the typical reasonable person have understood by the exchange between the officer and the suspect?” See Maj. Op. at 415, 119 A.3d at 833. The Majority concludes, applying the Jimeno test, that
[ljooking at the totality of the circumstances of this case, we cannot conclude that the lawful use of Varriale’s DNA was limited only to the rape investigation. It is undisputed that Varriale made no express limitation indicating that his consent was limited to or conditioned upon the DNA evidence being used exclusively in the rape investigation.
Maj. Op. at 418, 119 A.3d at 835.
The Majority’s assessment of the scope of Varriale’s consent, in my view, is so far removed from the reality of what a typical reasonable person would have believed, based on the totality of the circumstances in this case, as to boggle the mind of virtually any person-on-the-street in our State. A typical reasonable person, presented with the Consent Form at issue in this case, with a specific case number written on the top of the form identifying the aim and scope of the investigation as being a part of an ongoing, open rape investigation,[6] would assume that, indeed, the biological samples provided (and the DNA profile developed from the samples) would be used only in connection with the ongoing, open rape investigation. Furthermore, a reasonable person would understand the Consent Form to mean: “any evidence found to be involved in this investigation, being conducted by the Anne Arundel County Police Department can be used in any future criminal prosecution [of the alleged crime under investigation].” (emphasis added).
*432 By its own terms and the circumstances of the encounter between Detective Wood and Varriale, Varriale’s Consent Form limits the scope of the search (and its fruit) to use only in the rape investigation case (“this investigation”) and any future criminal prosecution related thereto. When Varriale’s DNA profile was compared to the DNA profile of the biological samples taken from under the alleged victim’s fingernails, his sample was found to exclude him as a suspect in the rape investigation and the scope of consent reached its limit. After that failed comparison, however, Varriale’s sample (during the automatic database search, see Maj. Op. at 406-09, 119 A.3d at 828-29) was compared to evidence samples not “found to be involved in this [rape] investigation,” to wit, every other sample from every unsolved crime for which there was a DNA sample entered into the LDIS suspect index; i.e., evidence from untold other investigations. A typical reasonable person would not understand Varriale’s Consent Form to encompass such a continuation of the use of the fruit of his sample.
The Majority is wrong to conclude, therefore, that Varriale did not limit expressly the scope of his consent. Varriale limited the scope of his consent — the standard Consent Form provided to him by the Anne Arundel County Police Department limited expressly the scope of his consent by its own terms. Because the Majority misunderstands the appropriate scope of Varriale’s consent, its Fourth Amendment analysis is flawed as well.
Even if the consent may be deemed not to be limited expressly to use of Varriale’s biological samples (and resultant DNA profile) only in the rape investigation, I cannot endorse that the Court of Special Appeals and the Majority here appear to expect a homeless person living in the woods to be able to appreciate that he needs to re-negotiate the terms of the pre-printed Consent Form to specify that his biological samples may not be used to investigate any imaginable crime other than the one being investigated. This is beyond the ken of a typical lay person, even one who is not a homeless person living in the woods. Unless and until the Public Defender or *433 private criminal defense attorneys open offices in the woods,[7] the Majority’s standard, as applied in this case, represents an unreasonable expectation of what a typical reasonable person in Varriale’s shoes would know to do.
II. Unreasonable Searches
Given the scope of Varriale’s consent, the subsequent analysis and database comparison of Varriale’s DNA profile with the DNA profiles associated with cold cases in Anne Arundel County is a separate search. On the facts of this case, this second search was an unreasonable one that violated Varriale’s Fourth Amendment rights. The “match” resulting from further testing of his biological materials should have been suppressed.
The Fourth Amendment guarantees that “[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated!.]” U.S. Const, amend. IV. Where an individual consents voluntarily to a search, that search does not violate his or her Fourth Amendment rights. See Maj. Op. at 411-13, 119 A.3d at 831-32 (discussing the standards for consent and “voluntariness”); State v. Green, 375 Md. 595, 609, 826 A.2d 486, 494 (2003) (“Where an individual’s encounter with the police is purely consensual, ‘no privacy interests [are] invaded and thus the Fourth Amendment is not implicated.’ ”) (quoting Ferris v. State, 355 Md. 356, 375, 735 A.2d 491, 501 (1999)). Once a search goes outside the scope of consent, however, it becomes unreasonable. See Jimeno, 500 U.S. at 252, 111 S.Ct. 1801 (“A suspect may of course delimit as he chooses the scope of the search to which he consents.”); Gamble v. State, 318 Md. 120, 129, 567 A.2d 95, 100 (1989) (“ ‘[A] consensual search may go no further than the limits’ defined by the consent.” (quoting State v. Jensen, 44 Wash.App. 485, 723 P.2d 443, 446 (1986))); Buckley v. State, 797 N.E.2d 845, 849 (Ind.Ct.App.2003) (“Because [consent to search] comes within an established exception to the Fourth Amendment warrant *434 requirement, the scope of the authority to search is strictly limited to the consent given, and a consensual search is reasonable only if it is kept within the bound of that consent.”); State v. Binner, 131 Or.App. 677, 886 P.2d 1056 (1994) (holding that a DNA sample taken for one purpose cannot be used subsequently for a different purpose without offending the Fourth Amendment); see also 4 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.1(c) (8th ed. 2014) (“When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent.”).
Varriale consented for his DNA profile to be compared only to the DNA profile gleaned from the fingernail scrapings of the alleged rape victim. Had the police recovered other biological materials from the victim of the alleged crime scene of the rape, comparison of that with Varriale’s DNA profile would have been fair game under the consent given here. The further DNA comparison, achieved by searching LDIS, was outside, however, the scope of Varriale’s consent. Once outside the scope of consent, the far-ranging comparison search became a warrantless second search. “[W]e look at any DNA collection effort as two discrete and separate searches. The first search is the actual swab of the inside of [the suspect’s] mouth and the second is the analysis of the DNA sample thus obtained, a step required to produce the DNA profile.” King v. State, 425 Md. 550, 594, 42 A.3d 549, 575 (2012), rev’d, Maryland v. King, 569 U.S. ___, ___, 133 S.Ct. 1958, 1980, 186 L.Ed.2d 1 (2013) (determining that, under the specific circumstances of the case, the second search was reasonable); see Raynor v. State, 440 Md. 71, 98, 99 A.3d 753, 769 (2014) (Adkins, J., dissenting) (“As I see it, two distinct events happened in this case that raise Fourth Amendment concerns. The first is the State’s collection of Raynor’s DNA from the police station chair after inviting him to the station for questioning, as which time he refused to submit to DNA testing. The second is the analysis and submission to the CODIS database of the DNA.”); see also United States v. Mitchell, 652 F.3d 387, 407 (2011) (“The second ‘search’ at issue is, of *435 course, the processing of the DNA sample and creation of the DNA profile for CODIS. This search also has the potential to infringe upon privacy rights.”).
As the Majority points out, in Raynor, 440 Md. 71, 99 A.3d 753, this Court held that “once the state lawfully possessed a suspect’s DNA, subsequent testing of that DNA does not amount to a Fourth Amendment search,” to wit, the State collected lawfully biological materials discarded by a suspect in his perspiration on a chair in the police station. Maj. Op. at 419-20, 119 A.3d at 835-36. I conclude, however, under the Katz test, that subsequent testing does amount to a Fourth Amendment search in the consent context of the present case.
The Katz test, from Justice Harlan’s concurrence to Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), remains the “lodestar for determining whether police conduct is a search for purposes of the Fourth Amendment.” Raynor, 440 Md. at 83, 99 A.3d at 759. The Katz test invokes a twofold analysis to decide what is protected under the Fourth Amendment. The first is that the person needs to have exhibited an actual (subjective) expectation of privacy, and the second, that the expectation be one that society is prepared to recognize as reasonable. Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring).
Every person should be presumed to start with an actual expectation of privacy in his or her DNA, although the vigor of that expectation may be diminished in those with a prior criminal record. DNA is not collected for employment purposes (like fingerprints are for some forms of employment). It is not recorded by the government at birth, at the issuance of a driver’s license, or at any point during a citizen’s life except in the investigation of a crime.[8] DNA differs from *436 fingerprints in the sheer wealth of information it contains.[9] See King, 425 Md. at 595, 42 A.3d at 576 (“We do not embrace wholly the analogy between fingerprints and DNA samples advanced in Judge Raker’s concurring opinion in [State v. Raines, 383 Md. 1, 857 A.2d 19 (2004) ] and by the State in the present case. As aptly noted, fingerprints are a physical set of ridges on the skin of a person’s fingers that, when exposed to ink (or other medium) and the resultant imprint placed on paper or electronic records, can determine usually and accurately a person’s identity by matching the physical characteristics to a known set of fingerprints. DNA, on the other hand, is contained within our cells and is collected by swabbing the interior of a cheek (or blood draw or otherwise obtained biological material).”), rev’d, 569 U.S. ___, 133 S.Ct. 1958; see id. at 595-96, 42 A.3d at 576-77 (“The information derived from a fingerprint is related only to physical characteristics and can be used to identify a person, but no more. A DNA sample, obtained through a buccal swab, contains within it unarguably much more than a person’s identity.”); Raynor, 440 Md. at 103, 99 A.3d at 771-72 (Adkins, J., dissenting) (“DNA has the potential to reveal enormous amounts of private information about a person. With today’s technology, scientists have the power to discern genetic traits, behavioral tendencies, propensity to suffer disease or defects, other pri *437 vate medical information and possibly more.”). DNA differs also from fingerprints because the acquisition of a biological sample sufficient to garner a DNA profile requires a comparatively greater intrusion into one’s body. Because DNA is harder to collect and analyze and is not “collected” routinely by the government in the same manner as fingerprints, people still maintain an expectation of privacy interest in their DNA.[10],[11]
*438 In United States v. Davis, 690 F.3d 226 (4th Cir.2012), the United States Court of Appeals for the Fourth Circuit found that the defendant maintained a privacy interest in his DNA when it was collected from his clothes. Davis went to the hospital for a gunshot wound, which he claimed resulted from being shot by a robber. Davis, 690 F.3d at 230. The officers that investigated Davis’s claim took his blood-soaked clothes and stored them in evidence in case they needed them during the investigation of the alleged robbery. Id. Investigating police decided to investigate Davis further, based on their conversations with him at the hospital. Id. The officers found marijuana in Davis’s car and arrested him on drug charges, which were dropped later. Id. The initial robbery investigation was not pursued and charges were not brought. Id. Davis’s bloody clothes were logged into evidence on the same sheet that connected Davis to the marijuana. Davis, 690 F.3d at 231. At that point, Davis was both a victim and an arrestee. Id. His DNA, however, was on items that pertained to his status as a victim. Id. Later, Michael Neal was murdered and Davis became a suspect. Id. His clothes from the earlier events were still in the evidence room of the Howard County Police Department. Id. The police took the clothes from when Davis was shot and, without a warrant, created a DNA profile from the blood, compared it to DNA found at the Neal murder crime scene, and discovered that *439 Davis did not match the DNA from the Neal murder crime scene. Id. Nonetheless, the police entered then Davis’s DNA profile into their local DNA database. Id. The general comparison search of Davis’s DNA profile with DNA profiles connected to “cold cases” in the local DNA database resulted in a “hit” to a different robbery and murder crime scene. Davis, 690 F.3d at 232. As a result of the hit, Davis was arrested. Id.
The Davis Court found that “a person who is solely a crime victim does not lose all reasonable expectation of privacy in his or her DNA material simply because it has come into the lawful possession of the police.” Davis, 690 F.3d at 244. In particular, the Davis court notes that, although sister courts recognize that “the Constitution allows the collection of DNA samples,” they “uniformly recognize” also that “persons who have not been arrested have a greater privacy interest in their DNA that persons who have been arrested.” Id. The Fourth Circuit’s reasoning in Davis between the different accorded privacy interests in DNA between an innocent person and an arrestee is compelling. Varriale was not an arrestee and had the fullest scope of the Fourth Amendment’s protections available to him, as did Davis as a victim.
Varriale exhibited an actual (subjective) expectation of privacy. His consent reduced temporarily, and in limited fashion, his reasonable expectation of privacy to the testing of his DNA in an effort to eliminate police suspicion regarding the rape allegation[12]; his consent did not forego suddenly, and *440 forevermore, any privacy interest in his DNA.[13] “Even an arrestee, who has a diminished expectation of privacy, does not forfeit forever all privacy interest in his effects.” Davis, 690 F.3d at 243. Furthermore, once he was excluded as the source of DNA found under the victim’s fingernails, his full expectation of privacy was re-established.[14]
Not only does the Majority refuse to recognize the actual expectation of privacy that Varriale had in his DNA profile upon exclusion as a possible suspect in the rape investigation, the Majority shies away further from recognizing outright that the second comparison search of LDIS was, indeed, a search, and discusses at length why it is not a search, but a use.[15] See *441 Maj. Op. at 418-21, 119 A.3d at 835-37. The reason, I suspect, the Majority rests its legal opinion on the scope of consent issue,[16] as opposed to the DNA as a search issue, is *442 because the United States Supreme Court’s holding in King, 569 U.S. ___, 133 S.Ct. 1958 supports the notion that subsequent DNA testing is a search. The holding in King is a narrow one and is based on the idea that DNA collection and analysis is a search. The United States Supreme Court held:
When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee’s DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.
569 U.S. at ___, 133 S.Ct. at 1980 (emphasis added). This does not mean that DNA analysis and comparison is not a search, only that, in the narrow factual context of an arrestee involved in a police booking procedure, it is a reasonable search.[17]
King offers little further assistance in the present case. The biological samples obtained from Varriale were not taken during an arrest. They were not taken pursuant to a police booking procedure. They were not taken in order to identify the giver of the samples as the correct pretrial defendant or for a pretrial custody decision. See King, 569 U.S. at ___, 133 S.Ct. at 1980. Varriale’s identity was known fully as one who consented voluntarily in an effort presumably to exclude himself from suspicion of an alleged rape.[18] The compelling *443 government interest of identification that made the further DNA search through CODIS reasonable in King does not exist here.
In Raynor, the Majority found that analysis by the police of the 13 identifying so-called “junk” loci is not a search under the Fourth Amendment when the biological sample was abandoned in perspiration on a chair in a police station. Raynor, 440 Md. at 75, 99 A.3d at 755. The DNA analysis in that holding was a single comparison of Raynor’s DNA profile with that of the DNA profile extracted from biological materials left on the rape victim. Raynor, 440 Md. at 76-77, 99 A.3d at 756. Raynor’s holding is of limited applicability to the case at bar, which deals not with the single comparison, but with a generalized, far-sweeping search of all DNA profiles in a cold case database. If, as in Raynor, the person is matched to the DNA profile of the initial qualifying case, and then arraigned, any subsequent DNA cold-case comparison will be determined by application of the Supreme Court’s decision in King. But that is not the case here. Yarriale (the person of interest) was excluded as the source of the DNA found on the victim as a result of the initial comparison. The subsequent comparison search of Varriale’s DNA profile in LDIS does not fall under King. As the Raynor court did not discuss the topic of general cold-case “fishing” investigative searches, Raynor does not provide the legal support for its conclusion that the Majority believes it does.
The Majority finds that the comparison search of the LDIS database of DNA profiles associated with cold cases cannot be a search because a person does not retain privacy rights once the police have obtained “lawfully” a DNA profile. See Maj. Op. at 442, 119 A.3d at 849. The Majority finds support for its decision in several cases, but those cases all have factual backgrounds that differ significantly, and do not lend strength to the Majority’s conclusion. In all of those cases, the defen *444 dants had their DNA collected because they were being booked for other crimes, which they had committed.[19] When *445 an individual has been arrested for probable cause, that *446 individual does have diminished privacy rights, as either an arrestee, or in some cases, an incarcerated person. Raynor, 440 Md. at 97-98, 99 A.3d at 768 (Adkins, J., dissenting). Biological samples may be collected, DNA profiles obtained, and comparison searches may be done for the purpose of identification, and the search will be deemed likely reasonable.
It is clear from today’s opinion that the Majority is not entirely in touch with what most of the people deem reasonable. I find it hard to imagine that society-at-large would find it unreasonable that a person believes he or she has a privacy right in his or her DNA. More precisely, society would find it reasonable that a person, who gave up voluntarily a biological sample and was excluded as a possible source of DNA recovered from the body of an alleged rape victim, had, from the moment of exclusion as a suspect, a re-established privacy right, in full vigor, in his or her DNA.
Without a warrant (or an exception to the warrant requirement), in order for the further LDIS search to be lawful, “it must be supported by reasonable, articulable suspicion.” Ferris, 355 Md. at 384, 735 A.2d at 506. This requires the State to “ ‘be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.’ ” Id. (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
In this case, no rationale that warrants a further intrusion into Varriale’s DNA profile or “identity” exists once the County excluded Varriale as a source of the biological materials recovered from under the fingernails of the alleged rape victim. After Varriale was excluded as a possible perpetrator, there were no facts to support supposition that Varriale committed any crime. There was no specific reasonable inference any member of the rape investigatory team could have articulated (or did articulate) that would provide the State with reasonable suspicion to run a separate search using his DNA profile, much less connect him to an unsolved commercial burglary committed four years earlier. “No matter the degree of invasiveness, suspicionless searches are never allowed if their principle end is ordinary crime-solving.” King, 569 U.S. at ___, 133 S.Ct. at 1982 (Scalia, J., dissenting).
*447 “The Fourth Amendment forbids searching a person for evidence of a crime when there is no basis for believing the person is guilty of the crime or is in possession of incriminating evidence. That prohibition is categorical and without exception.” King, 569 U.S. at ___, 133 S.Ct. at 1980 (Scalia, J., dissenting). Never has the Supreme Court “indicated] approval of a search whose primary purpose was to detect evidence of ordinary criminal wrongdoing. That limitation is crucial. It is only when a governmental purpose aside from crime-solving is at stake that we engage in the [ ] reasonableness inquiry----” King, 569 U.S. at ___, 133 S.Ct. at 1981-82 (Scalia, J., dissenting) (internal citations omitted). In this case, the only government purpose for running this search was general crime-solving. That is not a legitimate government interest that warrants the violation of the Fourth Amendment.
The “traditional standard of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual’s privacy.” King, 569 U.S. at ___, 133 S.Ct. at 1970 (majority opinion) (internal quotations omitted). Varriale’s DNA profile was protected by the guarantees of the Fourth Amendment from a subsequent cold-case database search after he was excluded as the source of the DNA recovered from the alleged rape victim. He had from that point the full privacy rights in his DNA that any other free citizen does. “Although we recognized (and no one can reasonably deny) that solving cold cases is a legitimate government interest, a warrantless, suspicionless search cannot be upheld by a ‘generalized interest’ in solving crimes.” King, 425 Md. at 598, 42 A.3d at 578, rev’d, 569 U.S. ___, 133 S.Ct. 1958. “Solving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches.” King, 569 U.S. at ___, 133 S.Ct. at 1989 (Scalia, J., dissenting). The second search was unreasonable.
In the dissent to Raynor, Judge Adkins wrote “the majority’s opinion will likely have the consequence that many people *448 will be reluctant to go to the police station to voluntarily provide information about crimes for fear that they, too, will be added to the CODIS database.”[20] 440 Md. at 108-09, 99 A.3d at 775 (Adkins, J., dissenting). If the Majority opinion in Raynor did not diminish a free person’s desire to assist the police, today’s decision will certainly. After today’s ruling, those who consent[21] to the taking of their biological materials, in an effort to help the police, will face a certain knowledge that, even if not suspected or convicted of a crime, the police can, and will, hold on to their DNA profile forever, and may compare it at any time for any or no articulable reason.
In light of the Majority’s opinion (and the potential future consequences), the time may be nigh for the enactment of additional legislation or regulations governing the collection and maintenance of DNA within local law enforcement databases to protect individuals such as Varriale, whose DNA is not otherwise protected by the Maryland DNA Collection Act.
I would reverse the judgment of the Court of Special Appeals in the present case and remand the case to the *449 intermediate appellate court with directions to reverse the judgement of the Circuit Court for Anne Arundel County and remand the case to the Circuit Court for further proceedings.
Judge ADKINS authorizes me to state that she joins the views expressed in this dissent.

. The Forensic Biology Report from the Anne Arundel County Police Crime Laboratory indicated that no blood or semen was found on the *426 person of the alleged victim. Furthermore, the partial DNA profile obtained from the alleged victim’s fingernail swabs was consistent with her own DNA profile. The State's Attorney’s Office declined charges in the case ultimately, and the case was closed "by exception,” whatever that means.

. The record is unclear regarding whether, before Varriale gave his biological samples, Detective Wood specified verbally that he was conducting an investigation of a rape.
Detective Wood's Investigative Report, detailing his actions of 10 July 2012, was included in the materials provided to the Circuit Court of Anne Arundel County in advance of the Motion to Suppress hearing. In pertinent part, Detective Wood’s Investigative Report states as follows:
I met with Officer Pederson in the wooded area.... [The subject] identified himself as George Varriale____I informed Mr. Varriale I was conducting an investigation and I wanted an opportunity to talk to him. I told him he was not under arrest and was not under any obligation to talk to me. He agreed to talk to me and he gave me consent to use a digital voice recorder for the interview.... I advised Mr. Varriale we would like to collect saliva swabs and penile swabs from him. I placed a completed Consent to Search Person form in front of him and read the form to him. He agreed to give the Anne Arundel County Police Department consent to a search of his person for the purpose of furnishing evidence relating to saliva and penile swabs.
The Investigative Report then recounts in detail the conversation Detective Wood had with Varriale, wherein they discussed Varriale’s activities the night before, his knowledge of the alleged victim, and Detective Wood’s further investigation of the matter.
As noted above in the Investigative Report, Detective Wood used a digital voice recorder to make an audio recording of his interview with Varriale. The recording begins, however, after the point in time when Varriale consented to have the conversation recorded, and begins with Detective Wood reiterating their earlier conversation and confirming that Varriale understood that he was not under arrest and was not obligated to talk to him. The audio recording sheds no light on how Detective Wood characterized the nature of the investigation to Varriale originally.
Regrettably, the Circuit Court judge presiding over Varriale’s suppression hearing prevented Detective Wood from developing the circumstances more fully through his testimony. During Detective Wood's direct examination, the following transpired:
[Detective Wood]: They had a subject found in a tent in that wooded area who identified himself as George, so I wanted to talk to the subject and, you know, still it’s very earlier [sic] in the investigation. I’m trying to figure out what’s going on, you know, he's located as a possible subject.
So when I arrived, I had all officers but one be there. I did have one officer with me just for officer's safely, I guess routine, and I *428 identified myself to the George subject and basically formed on what little I had, and (indiscernible) for him to talk to me.
THE COURT: Let me ask you a question.
[Detective Wood]: Yes.
THE COURT: His case, the relevance, Counsel, of the [2012] incident is just how they came in possession of the DNA sample, correct?
[Prosecution]: Yes.
THE COURT: Okay. Were in no need of going to any great detail on this event, are we?
[Prosecution]: No. Well, I intended to — the issue is, I believe, is consent.
THE COURT: Can we stipulate to anything here so that we can get the detective back to bigger and better things?
Discussion between the attorneys and the hearing judge ensued. Much later in the hearing, when the hearing judge turned his attention back to Detective Wood, he asked the witness two direct questions regarding a different factual issue and then dismissed the witness.

. See Maj. Op. at 405-06, 119 A.3d at 827 (reproducing the Consent Form in full).

. The underlined text reflects blanks on the document that were completed by hand. The remainder of the document appears to be a preprinted form. Clearly, the investigation was of a specific alleged crime (indicated by a case number) that is highly unlikely to have been the cold case burglary occurring four years earlier.

. As of the date when Varriale was excluded as a possible suspect in the rape investigation, his expectation of privacy as a citizen was restored to its full vigor. I will speak more to this status later. See infra Part II of this dissent.

. Most burglary investigations probably do not call for the collection of a penile swab, unless it is suspected that a penis was used as a burglary tool. In any event, this fact reinforces the notion that Varriale had every reason to believe it was only a rape allegation that was under active investigation.

. Or raccoons are accepted for matriculation in law schools.

. DNA may be recorded collected and recorded also during diagnostic medical procedures, like genetic testing, but the courts have made it abundantly clear that DNA medical testing is different than DNA testing done by the police. See Maryland v. King, 569 U.S. __, ___, 133 S.Ct. 1958, 1966-67, 186 L.Ed.2d 1 (2013) (determining that the DNA used for forensic DNA testing "does not show far reaching and complex *436 characteristics like genetic traits”); id. at ___, 133 S.Ct. at 1968 (noting that the CODIS loci are not "known to have any association with a genetic disease or any other genetic predisposition. Thus, the information in the database is only useful for human identity testing”). The DNA discussed here is simply that thought-to-be unimportant DNA that marks you as completely unique from virtually any other human on the planet.

. The Majority, like many other courts, insists that DNA and fingerprints are identical essentially. See Maj. Op. at 415-16, 119 A.3d at 833-34. The Supreme Court, in King, found that to be true in the case of arrestees, felons, and parolees, who already have a diminished expectation of privacy, and when there is a compelling government interest at play. I am disinclined to extend the Supreme Court’s reasoning to those who are not suspected of a crime (as was the situation of Varriale after he was excluded as a person of interest in the *437 rape investigation) when the government has no legitimate interest that warrants intrusion.

. Although the State, as of now, does not have the ability (without a warrant) to test for personal medical information, it still has access to material that contains that information. As courts become increasingly relaxed about DNA testing, citizens may fear that one day their medical information will be accessible. After all, as the United States Supreme Court points out in King, technology is improving quickly. The Supreme Court noted that “the FBI has already begun testing devices that will enable the police to process the DNA of arrestees within 90 minutes.” King, 569 U.S. at ___, 133 S.Ct. at 1977. This technological increase in speed leads one to believe reasonably that the same technology will make processing of medical records to become more readily available and faster as well. “[W]e cannot turn a blind eye to the vast genetic treasure map that remains in the DNA sample retained by the State.” King, 425 Md. at 596, 42 A.3d at 577, rev’d, King, 569 U.S. ___, 133 S.Ct. 1958.
Another potential fear is that a State or local law enforcement database containing DNA profiles could be hacked and persons unfettered by statutory limitations on the use of the data by law enforcement will have access to one's unique identity or one’s medical information. The fear that the database will be hacked is not so futuristic, given current events. See, e.g., Ken Dilanian & Ted Birdis, Officials: Second Hack Exposed Military and Intel Data, Associated Press, June 12, 2015, available at http://bigstoiy.ap.org/article/d842d75785Ib4a59aca2aecf2f 31995a/union-says-all-federal-workers-fell-victim-hackers; AP Source: Cardinals Allegedly Hack Astros Player Database, June 16, 2015, USA Today, available at http://www.usatoday.com/story/sports/mlb/2015/06/ 16/ap-source-cardinals-allegedly-hacked-astros-player-database/ 28816387/; Patricia Zengerle & Megan Cassella, Millions More Americans Hit by Government Personnel Data Hack, June 16, 2015, Reuters, available at http://www.reuters.com/article/2015/07/09/us-cybersecurityusa-idUSKCN0PJ2M420150709. Although the Supreme Court says it need not speculate about the risks posed by a system that "did not contain comparable security provisions,” King, 569 U.S. at ___, 133 S.Ct. at 1980 (internal quotation omitted), given the attributions to and projections about technological advances, due speculation is warranted also to technological weaknesses and the consequences resulting therefrom. It is cause enough for fear for someone to have your social security number, which is issued by the federal government. The fear would be untold if the information contained in your DNA was in *438 someone else's hands, especially if you are unaware the State has uploaded the DNA profile to databases that are more attractive to hackers, foreign or domestic.

. The Majority relies on the analogy between DNA and fingerprints to support its opinion. The Majority, as do a number of other courts, concludes that DNA is another booking procedure like fingerprinting, see Maj. Op. at 415-16, 119 A.3d at 833-34, even though fingerprint collection has not "undergone definitive Fourth Amendment scrutiny.” King, 425 Md. at 596, 42 A.3d at 577, rev'd, 569 U.S. ___, 133 S.Ct. 1958; see King, 569 U.S. at ___, 133 S.Ct. at 1988 (Scalia, J., dissenting) ("The 'great expansion in fingerprinting came before the modern era of Fourth Amendment jurisprudence,’ and so we were never asked to decide the legitimacy of the practice.” (quoting United States v. Kincade, 379 F.3d 813, 874 (9th Cir.2004) (Kozinski, J. dissenting))). But cf. King, 133 S.Ct. at 1976-77 (majority opinion) (discussing fingerprinting as a form of identification).

. In Fernandez v. California, 571 U.S. ___, 134 S.Ct. 1126, 188 L.Ed.2d 25 (2014), the Supreme Court found that a homeowner’s consent to search her house is valid, even if the other occupant objects, if the objecting owner is absent. One reason that a homeowner may consent to have their house searched even if the police could not obtain a warrant, the Court supposed, was that the owner believed he or she was under suspicion: “Where the owner believes that he or she is under suspicion, the owner may want the police to search the premises so that suspicions are dispelled.” Fernandez, 571 U.S. at ___, 134 S.Ct. at 1132. Surely, we cannot imagine that this means the State may enter the home at any time after that initial search consent; rather, we would demand that the police obtain consent for each and *440 every subsequent search. We would not find it reasonable that one instance of consent, designed to remove suspicion and help the police narrow their search to appropriate suspects, means the owner has given up forever his or her privacy interest in the home. To say otherwise would bestow on the police the same power Bram Stoker gave to Dracula and his brethren- — once invited over the threshold, they may enter at any time thereafter.

. From the Majority’s reading of what it takes for a person to exhibit an actual (subjective) privacy expectation in his or her DNA profile, Varriale might have been expected to wear a HazMat suit to ensure that his DNA could not land anywhere unintended.

. We offer this status to those who are: arrested, but have the charges dropped; tried actually, but not convicted; those whose conviction is reversed or vacated, and no new trial permitted; or the individual granted an unconditional pardon. See King, 569 U.S. at __, 133 S.Ct. at 1967. It would be unreasonable to think we do not offer that same protection to someone who is never even arrested.

. The Majority looks to the reasoning of several other courts to support its conclusion that a reasonable person would understand that, upon giving voluntarily a DNA sample without an express limitation on the use of that sample, his or her DNA profile would be retained forever by the State and, in weekly automatic searches, compared to DNA samples collected from crime scenes. See Maj. Op. at 406-08, 415-18, 119 A.3d at 828-29, 833-35. The Majority’s reliance on some of these cases is flawed. To the extent that the Majority relies on the similarity of fingerprints and DNA to justify the search, Maj. Op. at 415-16, 119 A.3d at 833-34, that is addressed above, supra at pp. 414-15, 119 A.3d at 833.
The Majority relies heavily on Commonwealth v. Gaynor, 443 Mass. 245, 820 N.E.2d 233 (2005). See Maj. Op. at 416-18, 119 A.3d at 834-35. The discussion in Gaynor is based on the interpretation of a consent *441 form. Because the Gaynor Court interprets the consent form in the same way that the Majority interprets Varriale’s consent form, they agree on the expectation a reasonable person would have. Since I find that interpretation incorrect, see supra Part I of this dissent, I find that a reasonable person would not have concluded what the Gaynor Court and the Majority believes they would have.
The Majority relies next on People v. Collins, 250 P.3d 668 (Colo.App. 2010). See Maj. Op. at 416-18, 119 A.3d at 834-35. The facts of this case are starkly similar to King. Colorado police matched ultimately Collins's DNA to the DNA left on a rape victim. Collins, 250 P.3d at 672. Collins had been under investigation initially for a robbery in Missouri. Collins, 250 P.3d at 671. Police in Missouri believed they could connect Collins to the robbery through DNA. Id. He consented to have his DNA tested. Id. Collins’s DNA matched the DNA the police obtained from the crime scene, as well as DNA from another Missouri crime scene that involved a home invasion and sexual assault. Id. The Missouri police noted that Collins had a Colorado arrest record and forwarded his DNA profile to the Colorado police. Collins, 250 P.3d at 672. It was found that Collins’s DNA matched the DNA found on a rape victim in 1999. Id. Although this case was decided four years before King, now that King has been decided, the jurisprudential value of Collins should be analyzed in light of King. Collins involved an arrestee: his DNA could be collected and his criminal history determined and ascertained as a part of getting the full picture of the arrestee’s identity. Pursuant to King, running the arrestee's DNA through a cold-case database is not a Fourth Amendment violation because of the legitimate government interest and the arrestee’s diminished privacy rights.
Collins does not inform us, however, about the proper outcome of the present case. The Majority's use of Collins as support that once the defendant gave his consent, he should have expected it would be used in any other case, presents two problems. First, there was no written agreement, but an oral one, between the police and Collins. The exact conversation is not discussed in the Collins opinion. So, we cannot analyze any potential differences between concepts of consent in Missouri and Maryland. Second, Collins’s DNA was matched to the crime for which he was suspected — the robbery. In light of King, we should not look here to Collins for guidance because the King decision renders moot the exact legal discussion of the scope of the arrestee’s consent. The only value for which the Majority may depend on Collins is its analysis that the Court took the defendant's lack of express limitation on the scope as evidence of no limitation, and that the police do not have to inform the suspect that the DNA will be used in subsequent investigation. These issues go directly to scope of consent, and were addressed in the first Part of this dissent.

. If the subsequent comparison with all the "cold-case” samples in LDIS is not a search, it does not matter where Varriale’s consent ended.

. The Fourth Amendment is only applicable when dealing with the right of the people against unreasonable search and seizure. The Supreme Court concluded that a buccal swab is a search. King, 569 U.S. at ___, 133 S.Ct. at 1969. The State also has the right to search (in the form of a buccal swab) the person of the accused when legally arrested. See King, 569 U.S. at ___, 133 S.Ct. at 1970. A buccal swab, however, does not give the State the identity of the person, unless it is analyzed, a profile created, and samples compared. It is that comparison of the subject profile with other DNA profiles derived from other biological samples that gives the State an individual’s identity (identity being the legitimate government interest in play in King). If identity is the product of the search, then the search is not just obtaining the buccal swab, but the analysis and comparison of its contents.

. Varriale was not arrested and was not going to be processed, charged, or tried. The reasons that justify a subsequent search for *443 identification purposes (one who has been arrested, who is being tried, and the criminal history to discover other offenses, or a record of violence or mental disorder, King, 569 U.S. at ___, 133 S.Ct. at 1971-72), do not exist in this case.

. The Majority focuses primarily on Wilson v. State, 132 Md.App. 510, 752 A.2d 1250 (2000). Maj. Op. at 421-23, 119 A.3d at 837-38. In that case, a blood sample from Wilson was collected pursuant to a warrant in connection with a 1991 rape investigation. Wilson, 132 Md.App. at 531-32, 752 A.2d at 1262. A DNA profile was not developed, however, because the victim made a positive identification of someone else during a police lineup in which Wilson participated. Id. When Wilson was suspected of committing a rape in 2000, the police obtained a warrant for his DNA. Id. When they re-discovered they had his DNA on file, however, they tested the DNA sample that they had stored from the previous rape investigation, rather than execute the warrant. Id. They did not run it against every cold case in the jurisdiction, as here, however; they performed basic analysis of two samples.
Notwithstanding the Wilson court's belief that, once DNA is in lawful police possession, no further Fourth Amendment intrusion occurs, I note that the Maryland DNA Collection Act makes clear that a DNA sample and profile must be destroyed if the individual is not convicted of a qualifying crime or if the original charges are dropped. Md. Code (2003, 2008 Repl. Vol., 2014 Cum. Supp.), Public Safety Article ["PS"] § 2-504(d)(2). The very inclusion of this provision implies to me that the Legislature found something uneasy (and perhaps unconstitutional) about keeping the DNA sample of that class of persons enumerated in the Md. DNA Collection Act: those for whom (a) qualifying criminal charges are determined to be unsupported by probable cause; (b) criminal action was begun against the individual relating to the crime but did not result in a conviction of the individual; (c) the conviction was finally reversed or vacated and no new trial was permitted; or, (d) the individual was granted an unconditional pardon See PS § 2-504(d)(2), § 2-511(a)(1)(f), (ii), and (iii). Although I admit Varriale does not fall under the Maryland DNA Collection Act, if a person arrested on probable cause has the right to have his or her DNA profile destroyed, why not the person who is not arrested and who is never charged with a qualifying crime? As Justice Scalia foretold, "the [Maryland DNA Collection] Act manages to burden uniquely the sole group for whom the Fourth Amendment protections ought to be most jealously guarded: people who are innocent of the state's accusations.” King, 569 U.S. at ___, 133 S.Ct. at 1989 (Scalia, J., dissenting).
The Majority relies also on Washington v. State, 653 So.2d 362 (Fla. 1994). Maj. Op. at 424-25 n. 13, 119 A.3d at 839 n. 13. In that case, the DNA was not run through a database. The defendant's DNA was collected for his suspected involvement in an assault. Washington, 653 So.2d at 363-64. He was suspected also in another crime (a murder). Id. The police compared his DNA, obtained in connection with the assault case, to the DNA found at the murder scene. Id. Thus, this was not a cold case search of a person not suspected of a crime through all databases. This search is permitted under King, but does *445 not provide guidance in the present case.
In addition, the Majority relies on State v. Hauge, 103 Hawai'i 38, 79 P.3d 131 (2003). Maj. Op. at 424-25 n. 13, 119 A.3d at 839 n. 13. Again, DNA was collected through a warrant in a robbery case investigation. Hauge, 79 P.3d at 135. The DNA collected pursuant to the warrant was compared to blood found at another crime scene in which the defendant was also a suspect. Id. This situation is similar to Raynor or King. Thus, Hauge did not involve a broad search as occurred in present case.
The Majority’s reliance on Smith v. State, 744 N.E.2d 437 (Ind.2001), is the most apt of the lot. See Maj. Op. at 424-25 n. 13, 119 A.3d at 839 n. 13. In that case, a defendant was accused of rape and suspected in a second rape. Smith, 744 N.E.2d at 438-39. He was acquitted of the first rape, but his DNA was run through the database. Smith, 744 N.E.2d at 439. It should be recognized that, in Maryland, the biological sample and DNA profile obtained therefrom would have been destroyed after the acquittal. See PS § 2—511 (a)(1)(i). Had it not been destroyed, but instead run through a database, the results would have been suppressed and the employee who ran it would have been found likely in violation of the Maryland DNA Collection Act. PS § 2-504(d)(2). This would have followed in order to protect a suspect who is not convicted of a qualifying crime.
The Majority relies next on State v. Bowman, 337 S.W.3d 679 (Mo. 2011). Maj. Op. at 424-25 n. 13, 119 A.3d at 839 n. 13. Bowman was convicted originally of two murders (though his conviction was later overturned and a new trial ordered). Bowman, 337 S.W.3d at 683. Bowman consented to have his DNA taken during the investigation of those murders. Bowman, 337 S.W.3d at 684. After Bowman’s conviction was overturned, that DNA sample was then sent to another state for specific comparison with a crime where Bowman was a suspect. Bowman, 337 S.W.3d at 685. This is a specific case comparison, not the general database search as in the present case. Furthermore, although the DNA was tested after Bowman’s conviction was overturned and he was on bail, Bowman, 337 S.W.3d at 695, this does seem to be the type of identification that the Supreme Court referred to in King. “Even if an arrestee is released on bail, development of DNA identification revealing the defendant’s unknown violent past can and should lead to the revocation of his condition release.” King, 569 U.S. at ___, 133 S.Ct. at 1974. Because Bowman was an arrestee with diminished expectation of privacy, and the type of identification there is a legitimate government interest, this case is in the same vein as King, but not the present case.
Finally, the Majority relies on State v. Notti, 316 Mont. 345, 71 P.3d 1233 (2003). Maj. Op. at 424-25 n. 13, 119 A.3d at 839 n. 13. The DNA comparison in Notti very clearly tracks King. The suspect was convicted, and after his conviction, his DNA profile was run through CODIS and matched to DNA left at a murder scene. Notti, 71 P.3d at 1235. Again, this is not the situation in play here. To rely on this case to support the conclusion that a subsequent CODIS search is not a search, but rather a "use,” is incorrect. The search occurred, but was deemed reasonable.

. Other than Raynor, approximately 20 other men consented to have their DNA taken by the police to be compared to the crime scene sample. Raynor v. State, 440 Md. 71, 76, 99 A.3d 753, 755 (2014). Given today's case, one can only imagine how many of those men (or any other individual who consents to a DNA swab expecting it to clear himself or herself) had their DNA profile run through LDIS, or how many of their DNA profiles are still in police possession. If you were to ask them, I imagine they would be startled to know the police not only may have kept their DNA profile, but could run it through a cold-case database, and continue to do so as often as the police please. Nevertheless, the Majority claims a reasonable person would expect such. See Maj. Op. at 406-08, 417-19, 119 A.3d at 828-29, 834-35.

. Unfortunately, there will be likely many more cases to come in which the DNA profile of an unsuspecting consenting citizen (be he or she a volunteer, such as Varriale, or a victim, such as the alleged victim in this matter or a victim of a shooting, see supra (discussing United States v. Davis, 690 F.3d 226 (4th Cir.2012)) is uploaded to a database of DNA profiles and compared regularly with past and future unsolved crimes. Today's Majority opinion is just a hop, skip, and a jump away from the Court licensing potential future police practice of, on a whim, running a victim's DNA profile through LDIS, on a “flyer.”