DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**UNGRAY LAMAR MURRAY,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D13-2527

[January 14, 2015]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Richard Oftedal, Judge; L.T. Case No. 502012F002108A.

Carey Haughwout, Public Defender, and Anthony Calvello, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Angela E. Noble, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Ungray Murray appeals his conviction for sexual battery, contending the trial court erred in denying his motion to suppress DNA evidence obtained pursuant to a search warrant because the affidavit in support of the warrant contained intentional misstatements and omissions. While the affidavit contained several misleading statements, we nevertheless affirm for two reasons. First, under the inevitable discovery doctrine, since the DNA evidence recovered from the crime scene matched Murray's DNA as uploaded to the nationwide CODIS registry, Murray's DNA connection to the victim would eventually have been discovered, even if he had not otherwise been a suspect. Second, given the totality of information contained in the affidavit, the established inconsistencies, even if exercised, were not sufficient to negate the magistrate's probable cause finding.

### *Factual Background*

The victim returned home after watching football with friends and fell asleep on her couch. At about 2:45 a.m., she was suddenly awakened by

the sound of a loud bang on her front door and an individual exclaiming, "It's the cops. Let me in." Concerned, the victim peered through her front door window, only to be partially blinded by a flashlight. She was able to see that the person appeared to be wearing "police pants," given their dark blue coloring and the "stick" attached to his belt. As the victim slowly opened her door, she asked about the reason for the visit; the man responded, "I'll let you know ma'am when I get in." Believing the answer to be unusual for a police officer, the victim attempted to shut the door, but the man overpowered her, forcing his way inside while warning, "Oh, you're not dreaming. This is for real." Upon this entry, the victim saw her assailant's full features, observing that he was a thin, dark-skinned African American male wearing a dark blue hoodie covering all but his eyes and mouth.

Terrified, the victim screamed and reached for her cellphone, but the assailant grabbed her by the neck and tossed the phone away. With the victim subdued, the assailant ordered her to remove her clothes, grab his penis, and "put it" inside her vagina. In response, the victim took off her pants and did as told. The assailant then asked whether he was "in." When the victim responded, "Well, I don't know, I'm in menopause," the assailant became bewildered, muttering to himself about "menopause" and "seed"—a euphemism, the victim believed, for the assailant "planting a pregnancy."

The assailant asked the victim where she kept her money. Unhappy with the victim's response, the assailant choked her to the point that she collapsed on her couch. He threatened, "Do you want to die, because you are[.] And I'm the one that's going to kill you." The assailant then struck the victim's face, breaking her tooth, and repeatedly hit her in the temple. The victim began chanting "the Lord's Prayer," which only angered the assailant. Eventually, the assailant told the victim to "shut up" before strangling the victim until she lost consciousness.

Two hours later, when the victim came to, she found herself lying on her couch under a cardboard box that had been set on fire. The victim's hands and feet were tied together by electrical cords. She was able to free herself, douse the fire with water, and call her neighbor to report the incident. Thereafter, authorities transported her to a local hospital, where doctors examined her and recovered DNA swabs from her vagina for later testing.

At the hospital, the victim met with a detective to chronicle her ordeal. In a recorded interview, she told the detective that she suspected her assailant to be "Andre"—an employee of J.A.Y. Ministries who had cut her grass the previous year. "Andre" established a relationship with her,

coming to her house in non-work hours to smoke cigarettes and discuss life. As one thing led to another, Andre several times expressed his romantic interest in the victim, which she rebuffed. One way Andre expressed his interest was by telling the victim, "One day I'll put a *seed* in you, you'll see. There will be a little Andre in you one day"—using the term "seed" just as the assailant did in his moment of bewilderment.

Aside from this odd locution, Andre's build and mannerisms fit the characteristics of the victim's assailant. Andre was the only person the victim knew to be as thin and dark as her assailant. Further, the assailant's distinctive white teeth matched those of Andre, and the assailant never cussed or acted rough "like a thug"—much like Andre. In fact, the victim believed her assailant even smelled like Andre, since she remembered the type of soap Andre used.

With this information, the detective contacted J.A.Y. Ministries and learned of an employee named "Ungray Murray" who fit the description. During a voluntary interview, Murray told the detective he knew the victim from his days cutting her grass for J.A.Y. Ministries, but he had not seen her in a year. Murray further explained that he never had a personal relationship with the victim and never stepped foot in her house. Nevertheless, to clear his name, Murray allowed the detective to obtain a sampling of his DNA.

Somehow, law enforcement misplaced this DNA sample. A detective obtained a search warrant to recover a second DNA sample from Murray. Pertinent to this appeal, the detective's affidavit supporting the search warrant set forth the following facts related to his investigation:

> [During the hospital interview, the victim] stated that she knows a subject who she called "Andre", later identified as Ungray Murray . . . . According to [the victim], Murray "[t]ook too much liking to her" as she continued to reject him. [The victim] stated that she met Murray approximately 1 year ago as Murray worked on lawns in the neighborhood with "Jay Ministries". According to [the victim,] Murray was incarcerated back then and got out of jail on July of 2011. [The victim] stated that she has rejected Murray's advances and has asked him to leave her property. [The victim] stated that Murray matches the weight, height, and voice of the suspect who raped her. [The victim] states that Murray, just like the suspect who raped her, does not curse and that the suspect and Murray have very "White teeth".

- 3 -

**Approximately one week from the time of the incident, [the victim] stated that the subject who tried to kill her and sexually battered her was Ungray Murray. [The victim] stated that she was 99% sure.** [The victim] met Murray at her residence because he did "yard work" for her. Murray later confirmed working for [the victim] in a sworn recorded statement, after being advised of his Miranda rights.

(Emphasis added).

After the search warrant's issuance, the detective obtained a second DNA sample from Murray and submitted it for testing. Not only did a comparison of sperm fractions found on and inside the victim match Murray's second DNA sample, but they also matched Murray's DNA as inputted in 2006 into the Combined DNA Index System ("CODIS").

### *Motion to Suppress*

Prior to trial, Murray moved to suppress the DNA sample obtained via the search warrant, contending, among other things, that the detective's affidavit contained false statements and omissions sufficient to invalidate the finding of probable cause. Specifically, Murray contended that, contrary to the affidavit, the victim did not identify "Ungray Murray" as the person who attacked her, nor did she tell the detective a week after the incident that "she was 99% sure" of Murray's involvement. As to omissions, Murray asserted the victim told the detective in her taped interview at the hospital "that she 'can't see it being Andre' but that he's about the closest she can come to in terms of build." The victim further explained in the same interview "that even though 'Andre' had a similar size and voice to the" assailant, a lot of men near Riviera Beach had similar voices and sizes.

During the suppression hearing, the parties stipulated that the victim's pre-trial deposition would serve as her testimony. The victim stated that she "wasn't positive" who perpetrated the sexual assault at the time she first met with the detective, but she "suspected" Andre's potential involvement given his physical characteristics and his use of the term "seed." Such uncertainty was evident in the following dialogue recorded during her hospital interview the morning of the incident:

[Detective]:        [Y]ou mention this gentleman Andre, okay tell me about him.

[The victim]:      Well, he just looks like the size you know the build just Andre.

| [Detective]: | How about his voice, you said his voice sounds familiar? |
|---|---|
| [The victim]: | Yeah, well . . . |
| [Detective]: | Familiar? |
| [The victim]: | Yeah, as around there in Riviera Beach, **all the guys' voices and they're all about the same size all along Riviera Beach**. Now Andre was somebody that took too much of a liking to me. |
| [Detective]: | Okay. |
| [The victim]: | And I said "no," you know "just go." **But I can't see it being Andre** but to notice the build or anything, he's the closest I could you know come to. |

(Emphasis added).

The day after the hospital visit, the victim met with the detective for a second time, during which the victim identified a picture of Murray as "Andre"—her suspected assailant. Regarding her relative certainty of Murray's involvement at the time, the victim stated in her deposition as follows:

| Q: | Did you tell [the detective] that you had any doubts, that you were sure, that you weren't sure, that you were 50% sure? What did you say? |
|---|---|
| [The victim]: | That I was pretty sure. |
| Q: | Did you give a number? |
| [The victim]: | Not really. |
| Q: | Okay. Did you say that you were like 75% sure, fifty? |
| [The victim]: | Ninety percent if you want a number. I said 90%. |

Q:  No, I don't want a number.  I'm wondering what you said to him.

[The victim]:  Well, that's just it.  If you – about 90%.  I wasn't totally sure, at first.

Q:  Well let me go back.  I didn't ask that question well at all because I led you into it.  Tell me what you told him about how sure you were.

[The victim]:  Ninety percent.  I said I'm pretty sure.  This is who I think it is.

Q:  Okay.  So the words that came out of your mouth was –

[The victim]:  This is who I think it is.

Q:  Okay.

[The victim]:  Yes.

Q:  And the 90% thing, you were telling me that.  That's not what you told the officer that day, right?

[The victim]:  I just said, this [is] who I think it is.

Q:  Okay.

[The victim]:  It wasn't no percentage at the time.

Q:  Okay.

[The victim]:  It was just, this is who I think it is.

During the suppression hearing, the detective described his investigation.  He testified that upon receiving the victim's suspicions of "Andre," he went to J.A.Y. ministries, where he learned of Ungray Murray. The following day, after meeting with Murray, the detective contacted the victim over the phone, at which point she stated she was "99% sure that the person that cut her grass was the person that attacked her."  The

- 6 -

detective conceded, however, that the victim never stated without qualification that "Ungray Murray" was the person who assaulted her.

A forensic biologist with the Palm Beach County Sheriff's Office testified regarding the procedures used to match Murray's DNA with the sperm fractions recovered from the victim. The biologist explained that in comparing Murray's second DNA sample to the DNA evidence recovered from the victim, she also received a match with Murray via the CODIS registry, since his DNA had been uploaded to the system in 2006. The biologist testified that had there been no suspect for the victim's sexual assault, she ultimately would have run the victim's DNA evidence through the CODIS system and received a match with Murray.

The trial court denied the suppression motion upon two grounds. First, the trial court found that the inevitable discovery doctrine applied, since the DNA samples obtained from the victim "produce[d] a CODIS hit which linked [Murray] directly to the crime"; the court found it logical to infer "that ultimately in the absence of a suspect [the DNA evidence recovered from the victim] would have been submitted" for testing, which would have resulted in the CODIS match. Second, the trial court denied the suppression motion on its substantive merits, finding that while "the affidavit itself certainly wasn't entirely accurate," the detective had, at the time, "already verified through his conversation with [Murray] . . . that . . . Murray had in fact cut the victim's grass and knew her." Further, the trial court believed the victim's statement at the hospital that "it couldn't have been Andre" was more likely than not a statement "reflecting disbelief that this person that she knew and had talked to and had cut her grass previously could have been this person who brutally attacked and raped her."

Murray's case proceeded to trial on the charges of sexual battery with force and attempted felony murder. The jury acquitted Murray of the attempted murder charge and found him guilty of the lesser included offense of sexual battery.

In his primary issue on appeal, Murray contends that the denial of his motion to suppress the DNA match was error "because the affidavit utilized by [the detective] was invalid, due to the detective's false statements or misrepresentations of significant material facts from the search warrant's application affidavit."

"'On a motion to suppress the fruits of a search in accordance with a warrant, a trial court examines whether the issuing magistrate had a substantial basis for concluding that probable cause existed, and this

- 7 -

determination is made by examining the affidavit in its entirety.'" *Pilieci v. State*, 991 So. 2d 883, 892 (Fla. 2d DCA 2008) (quoting *State v. Vanderhors*, 927 So. 2d 1011, 1013 (Fla. 2d DCA 2006)). Applying this standard, we afford the magistrate's determination "great deference" while focusing our inquiry on whether, "based on the totality of the circumstances, and a common sense assessment, probable cause is shown." *Martin v. State*, 906 So. 2d 358, 360 (Fla. 5th DCA 2005) (citing *Pagan v. State*, 830 So. 2d 792, 806 (Fla. 2002); *McCall v. State*, 684 So. 2d 260, 262 (Fla. 4th DCA 1996)); *State v. Rabb*, 920 So. 2d 1175, 1180 (Fla. 4th DCA 2006) (citing *United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005)). As the Supreme Court explained in *Illinois v. Gates*, 462 U.S. 213, 236 (1983):

> after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts. A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant [and] courts should not invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.

*Id.* (internal quotations omitted).

Where there is no attack on the contents of an affidavit supporting a warrant application, review of a magistrate's probable cause determination is typically limited to the contents of the warrant application, including the "four corners of the supporting affidavit." *Williams v. State*, 130 So. 3d 757, 759 (Fla. 2d DCA 2014) (citing Art. I, § 12, Fla. Const.); *Redini v. State*, 84 So. 3d 380, 382 (Fla. 4th DCA 2012).

However, an evidentiary hearing is warranted where the defendant makes a substantial preliminary showing that (1) the affiant knowingly or intentionally, or with reckless disregard for truth, made untruthful statements or omitted important facts and (2) the untrue facts were necessary for the finding of probable cause or the omitted facts, "if added to the affidavit, would have defeated probable cause." *Pagan,* 830 So. 2d at 807. The second district has explained the dynamics of such a hearing:

> Under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), if a defendant makes a substantial preliminary showing that the affiant knowingly or intentionally or with reckless disregard for the truth included

a false statement in the affidavit, and that statement was necessary to the finding of probable cause, the circuit court must hold a hearing. If the defendant establishes these allegations by a preponderance of the evidence, the court must suppress the fruits of the search. The federal courts have extended the reasoning of *Franks* to apply to an allegation that law enforcement omitted material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading. *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citing *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)); *see also Johnson v. State*, 660 So. 2d 648, 656 (Fla. 1995) (adopting the reasoning of *Colkley* to extend *Franks* to apply to material omissions resulting from "intentional or reckless police conduct that amounts to deception").

*Pilieci*, 991 So. 2d at 893. "In short, to meet the *Franks* test, police conduct must rise to the level of hoodwinking or bilking, duping the issuing judge or magistrate into signing the warrant . . . ." *State v. Petroni*, 123 So. 3d 62, 65 (Fla. 1st DCA 2013).

Applying this procedure, a reviewing court's finding that the police acted in a deceptive manner will not, by itself, result in automatic suppression. Under such circumstances, the reviewing court

must excise the erroneous material and determine whether the remaining allegations in the affidavit support probable cause. If the remaining statements are sufficient to establish probable cause, the false statement will not invalidate the resulting search warrant. *See Terry v. State*, 668 So. 2d 954 (Fla. 1996). If, however, the false statement is necessary to establish probable cause, the search warrant must be voided, and the evidence seized as a result of the search must be excluded. *See id.* (citing *Franks*, 438 U.S. at 156); *see also Thorp v. State*, 777 So. 2d 385 (Fla. 2000).

*Garcia v. State*, 872 So. 2d 326, 330 (Fla. 2d DCA 2004) (quoting *Pagan*, 830 So. 2d at 807).

*Even if the warrant was deficient, the DNA match to Murray is admissible under the inevitable discovery doctrine*

Regardless of the affidavit's omissions or falsities, the trial court correctly concluded that Murray's second DNA swab was admissible under

the inevitable discovery doctrine. "Under this exception, evidence obtained as the result of unconstitutional police procedure may still be admissible provided the evidence would ultimately have been discovered by legal means." *Maulden v. State*, 617 So. 2d 298, 301 (Fla. 1993). The rationale is that the "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix v. Williams*, 467 U.S. 431, 446 (1984).

"For the inevitable discovery doctrine to apply, the State must establish that the evidence would have been discovered 'by means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure.'" *Rowell v. State*, 83 So. 3d 990, 995 (Fla. 4th DCA 2012) (quoting *Craig v. State*, 510 So. 2d 857, 863 (Fla. 1987)). "In other words, the case must be in such a posture that the facts already in the possession of the police would have led to this evidence notwithstanding the police misconduct." *Moody v. State*, 842 So. 2d 754, 759 (Fla. 2003). The prosecution must also "show that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Rowell*, 83 So. 3d at 995.

In this case, law enforcement obtained DNA evidence from the victim the morning of her sexual assault. In comparing this evidence to Murray's second DNA sample, the assigned forensic biologist testified that she also ran the results through the nationwide CODIS system, which returned a match for Murray. Even assuming that the search warrant was not supported by probable cause or that Murray had not been identified, given the nature of the crime, law enforcement would eventually have tested the sperm fractions recovered from the victim and run them through the CODIS system, resulting in a match with Murray. *See, e.g., State v. Notti*, 71 P.3d 1233, 1239 (Mont. 2003) ("Notti's DNA profile would have been placed on the State's DNA Identification Index and submitted to CODIS, which would have inevitably led to the discovery of a match by either a CODIS computer check or when another Crime Lab employee compared profiles in the 'forensic unknown' database with the State's DNA Identification Index."); *United States v. Gross*, 554 F. Supp. 2d 773, 776-77 (N.D. Ohio 2008) *aff'd in part, rev'd in part*, 624 F.3d 309 (6th Cir. 2011) ("As the use of Defendant's on-file DNA would not invoke[] any Fourth Amendment issue, the Government was free to compare the DNA from the firearm to Defendant's DNA in possession of the State of Ohio. As DNA does not change over time, the Government inevitably would have matched Defendant's DNA to the DNA on the firearm, even without a warrant for the buccal swab.").

*The deficiencies in the affidavit do not negate the finding of probable cause*

Alternatively, the trial court did not err in finding the affidavit's misstatements or omissions insufficient to negate probable cause. A probable cause inquiry is an inexact science, not "susceptible to formulaic determination." *Doorbal v. State*, 837 So. 2d 940, 952 (Fla. 2003). When making the determination,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238; *see also Green v. State*, 946 So. 2d 558, 561 (Fla. 1st DCA 2006).

Murray's chief argument derives from the detective's statements in his affidavit that the victim identified "Ungray Murray as the person who attacked her" and "stated that she was 99% sure" of that fact. While it is true—as the detective conceded at the suppression hearing—that the victim never referred to her assailant as "Ungray Murray," the victim did identify a picture of Murray as the "Andre" she suspected to be her assailant. Furthermore, the victim during her hospital interview provided substantial descriptions justifying her reasons for suspecting Andre, particularly his likeness in physical appearance and vocal and physical mannerisms.

To the extent the victim was not 99% certain during her second interview that her assailant was "Ungray Murray," this conjecture, when excised, does not negate a finding of probable cause. According to the remaining portions of the affidavit, the victim told the detective that Andre mowed her lawn while working for J.A.Y. Ministries, that he frequently expressed romantic interest in her, and that he "match[ed] the weight, height, and voice of her suspect[ed]" assailant as well as his mannerisms. During a later interview, Murray confirmed his business relationship with the victim and J.A.Y. Ministries, demonstrating that he was the "Andre" the victim purported to know. Probable cause is a relatively flexible threshold, dependent upon a common-sense determination. It cannot be said that the search warrant would not have issued without consideration of the challenged facts.

The same reasoning applies to the omissions from the affidavit. First, Murray contends that the detective's affidavit should have included the victim's statement from her hospital interview that she "can't see it being Andre." However, as the trial court found, this statement could easily be

- 11 -

interpreted as a side comment expressing her disbelief that a person she knew could have been capable of such a crime. Next, Murray contends the detective should have included the victim's statement from the same interview that "Andre" had a similar voice and size to many men in Riviera Beach. While this statement would have shed light on the strength of the victim's identification, it does not negate the other facts in the affidavit that established "Andre's" connection to the victim. Had the omitted facts been included in the affidavit, there would still have been probable cause to obtain a DNA sample from Murray.

We have considered the other issue raised on appeal and find no abuse of discretion in the trial court's ruling on the additional jury instruction.

*Affirmed.*

DAMOORGIAN, C.J., and MAY, J., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***