DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

STATE OF FLORIDA,

Appellant,

v.

JASON LUIS DOMENECH,

Appellee.

No. 2D2022-3005
_____

May 8, 2024

BY ORDER OF THE COURT:

Upon consideration of appellee's motion for rehearing and rehearing en banc, as well as appellee's motion to redact names of minors from opinion,

IT IS ORDERED that the motion to redact names of minors from opinion is granted to the extent that the opinion dated February 9, 2024, is withdrawn and the attached opinion is substituted therefor. In all other respects the motions are denied.

No further motion for rehearing or rehearing en banc will be entertained in this appeal.

I HEREBY CERTIFY THE FOREGOING IS A
TRUE COPY OF THE ORIGINAL COURT ORDER.

MARY ELIZABETH KUENZEL
CLERK

DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

STATE OF FLORIDA,

Appellant,

v.

JASON LUIS DOMENECH,

Appellee.

No. 2D2022-3005
_____

May 8, 2024

Appeal pursuant to Fla. R. App. P. 9.140(c)(1)(b) from the Circuit Court for Pinellas County; Chris Helinger, Judge.

Ashley Moody, Attorney General, Tallahassee, and William C. Shelhart, Assistant Attorney General, Tampa, for Appellant.

David T. Weisbrod, Tampa, for Appellee.

ATKINSON, Judge.

The State appeals the trial court's order suppressing evidence discovered from the search of Mr. Domenech's laptop computer. The trial court held a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), following which it concluded that the police detective's affidavit submitted in support of the search warrant contained several false

statements made in reckless disregard for the truth, and that without those false statements the affidavit did not establish probable cause for the search. We reverse because competent substantial evidence does not support the trial court's conclusion as to the falsity of at least one of the detective's statements, and the remainder of the affidavit with the retention of that statement still supports a finding of probable cause.

## Background

The investigation of Mr. Domenech began when his then-girlfriend went to the Clearwater Police Department and spoke with a detective about a series of events that led her to "believe[] that there was child pornography on a laptop that belonged to Mr. Domenech." She discovered the laptop with a "thumb drive" attached to it in a backpack in their bedroom, and believed it was the laptop that she knew Mr. Domenech "typically kept away." Based on other evidence gleaned from the girlfriend, the detective learned that Mr. Domenech had told the girlfriend that "you cannot access what's on the laptop without a Linux or TOR browser, or it will alert law enforcement." Pursuant to "an open agreement" the girlfriend described that "she and Mr. Domenech had . . . with their cell phones," the girlfriend had discovered on his phone pictures of whom she described as clothed, "underage girls," some of whom were wearing things such as "dance clothes and leotards" and appeared to be between the ages of eight and thirteen. There were also images of adult women and a picture of the girlfriend's eighteen-year-old daughter in a bikini.

The detective concluded that the information that he had received from the girlfriend up to this point was insufficient to establish probable cause necessary for a warrant to search the laptop. To continue an investigation, the detective organized a controlled call between the

2

girlfriend and Mr. Domenech, which was monitored and recorded by law enforcement. The following is an unedited transcript of the relevant portion of the conversation, with the exception of redactions made to the names of minors:

[Girlfriend]: So are you—like, you're outside? Like, are you able to talk? I just . . .

[Domenech]: Yeah, I can talk.

[Girlfriend]: Okay. Um, I'm just thinking about, like, our conversations and, you know, some of your text messages where you're—you know, you're saying you—you know, you want to get help and you want me to be by you side. And I just want to know, like, what—what does that look like? How do I - I - I don't even know, like—how do I help?

[Domenech]: I want—I want you, baby. I wanna be with you. I want you to be by my side. You know? I will go to counseling, you know, and do whatever I have to do. You know? It's—it was just—I've never hurt anybody, you know. I would never hurt you or anybody in my life. You know, it—it's just . . .

[Girlfriend]: (Jason)

[Domenech]: I—the p—it—it's so embarrassing. And I'm so deeply ashamed that, you know, I—I struggle with porn and it g—and it got carried away down that rabbit hole, you know? And  . . .

[Girlfriend]: Like, how?

[Domenech]: It's just a f- . . .

[Girlfriend]: How long? Like, how long?

[Domenech]: How long what?

[Girlfriend]: How long have you been, you know, looking at these underage girls?

[Domenech]: Um, I don't know. You know, it—like I said, it—I haven't been looking at them for, you know, a long time since we've been together, you know? But when I left ([my ex]), you know, I kinda went into a deep, dark place and—you know?

3

It—I just—I don't even know how it happened so gradually over those years, you know?

[Girlfriend]: Uh, like—so, like, the only way we can—like, I can help you and we can get through this is, like, you have to be honest with me. Now I don't . . .

[Domenech]: (Unintelligible) Uh, the first time I ever—the first time I ever saw an image like that, well, I was in college and my—a friend of mine showed me something called use groups or newsgroups, or—I can't even remember what they were called back then. And that was the first time, you know? But then it was like years—years had gone by, you know, and I haven't—there was—there was—you know, it's not something that I've been doing for my entire life or even my entire adult life. It's only been within the last, like, five years. It's you know, six years.

[Girlfriend]: It's like—these girls look really young. Like, how old do you think these girls are?

[Domenech]: I don't know. Baby, I—I hate to even guess. You know? And I know it's wrong, and it's more of the—you know—forbidden nature of it that I—that I get sucked into. You know?

[Girlfriend]: I mean, I feel s . . .

[Domenech]: Yeah, I know it's wrong to fuckin' look at those pictures. And I promise to God, baby, I'll never fuckin' do that again. And I promise to God I (unintelligible) honorably and respect you. And I will respect the kids. I've never, ever fuckin' done anything.

[Girlfriend]: I just—I feel so—I feel so, like, inadequate. Like, shame that you—that this is what turned you on. Like, I—I saw . . .

[Domenech]: No, baby, it's not. It's not what turns me on. You turn me on. And it was always like, it's—it was—for me, it p—it's pornography in general. You know, that's the problem. And it's always been. Um, I've always been looking for that next thing. You know, I was always—it's like fuckin' drugs, I guess, you know? It's like, you're always lookin' for that next high, that next fuckin' new thing that you haven't seen before. You know? And it's not—um, that's not the only porn I look at, you know? That's what I'm s—I'm tryin' to say.

4

It's like I was always switching it up and it's just—oh, fuck, I'm so fuckin' embarrassed.  Oh God.

[Girlfriend]: I mean . . .

[Domenech]: Sometimes it's fat girls, sometimes it's skinny girls.  Sometimes it's, you know, young girls.  Sometimes it's fuckin'—you know?

[Girlfriend]: But why?  Like, why?  If . . .

[Domenech]: I don't know that I can answer the why, baby, just that—it's never gonna happen again.

[Girlfriend]: Well, I mean, you just associated it to being like a drug addict, right?  So that's what I'm saying is, like, how—it clearly got worse.

[Domenech]: Yes.

[Girlfriend]: I don't . . .

[Domenech]: But with you, I've gotten—I've been . . .

[Girlfriend]: Hmm.

[Domenech]: . . . a lot better.  I don't feel the need to look at that stuff.

[Girlfriend]: So—but wha—why are you saving all this stuff that—like, why do you still have it?  Like, if you don't need it, then why is it there?

[Domenech]: I—I don't—why does, you know, an alcoholic keep booze around in case he actually wants something later on down the road?  I don't—I don't know, baby.  That—I don't know.  I don't have an answer for that.  You know?  Other than—you know, that specific material is not something that you're gonna find on the open internet.  You know?

[Girlfriend]: So . . .

[Domenech]: And so I saved it so that I would have access to it later.  You know?  That—that's the God's honest truth.  And—and—but the honest truth is also, baby, that you made me a better man and I'm not doing that stuff anymore.

[Girlfriend]: I need to talk to you about ([my daughter]).

[Domenech]: Okay.

[Girlfriend]: I need you—I need you to explain to me why you have pictures of ([my daughter]).

[Domenech]: It was a couple pictures where she looked really cute in a bathing suit. That was it. And I'm sorry. And it's—you know. I have never done anything with them, I swear to God on my life. And I do not look at her that way.

[Girlfriend]: Then why have them? Why have them? Like, I—I—I—I'm trying to wrap my mind around this, and I'm trying to understand. I'm trying to figure out how it is that I help you when it feels like you don't really have control.

[Domenech]: I—you help me have—you help me control. Baby, please, please. It was—it was—it's—it was all—it's—porn is fantasy that I will never act on, you know?

[Girlfriend]: So you said that, like, it doesn't—you would never hurt anybody. Don't you think it hurts these girls?

[Domenech]: Yes.

[Girlfriend]: Like—like, you're—you're—you contributing by watching and downloading all of that—like, don't you think that hurts these little girls?

[Domenech]: Yes, I—I—I do. I—I understand that. And . . .

[Girlfriend]: How—how old are . . .

[Domenech]: (unintelligible)

[Girlfriend]: How old are your nieces?

[Domenech]: I don't—I don't know. They're a couple years younger than [child's name redacted] and [child's name redacted].

[Girlfriend]: I mean, these girls look like they're that age.

[Domenech]: I would never—and I don't look at my nieces and I would never do anything like that, baby. I'm a good person. I'm a good person. And I have—you know, it's just—what goes on in a person's mind, sometimes, you know? It's like . . .

[Girlfriend]: Okay, just breathe. Right. I'm just—I'm just trying to understand. I'm just—I'm just trying to understand so that I—I know how to help. I—I—and . . .

[Domenech]: I want to come home to you, baby.

6

[Girlfriend]: I just need to sort this all out. And that's why I just wanted to talk to you, and I just wanted to these questions off my mind. So, I mean, when you go to your—that's what you—that's why you kept the laptop at your mom's house, 'cause you didn't want me to see what's on there?

[Domenech]: I kept it over here because I don't have a use for it half the time.

[Girlfriend]: Or you don't have a use for it because you don't—you can't do what you want to do because I'm there.

[Domenech]: No, baby. I don't even use the laptop anymore. That's what I'm tryin' to tell you.

[Girlfriend]: We just . . .

[Domenech]: That's not why I was coming over here.

[Girlfriend]: Okay. But do you recall our conversation a couple months ago when I got upset because you told me you were looking at porn? I got upset. Do you remember?

[Domenech]: Yes. Mm-hm.

[Girlfriend]: Okay, I just need you to be honest with me. Please don't—you're—you're now making it sound like . . .

[Domenech]: I . . .

[Girlfriend]: . . . I had.

[Domenech]: I know, I know. Uh, that's not the porn I was looking at. I was looking at porn on my phone.

[Girlfriend]: Okay, so you were looking at porn on your phone.

[Domenech]: Yes.

[Girlfriend]: And these—these young girls aren't on your phone?

[Domenech]: No.

[Girlfriend]: Okay.

[Domenech]: There's only one—there's like one or two sites that I go to on my own. And that's it. You know . . .

[Girlfriend]: (Unintelligible)

7

[Domenech]: . . . it's either like YouPorn or xHamster.  That's about it.

[Girlfriend]: Okay.  So how long ago did you, you know, download these extra sites so that you don't get in trouble?

[Domenech]: The applications?

[Girlfriend]: Yes.

[Domenech]: A—a long time ago, probably—like I said, five, six years ago.  And honestly, it started as, you know—I—it—I didn't download those things to go f—to go find that porn.  I was downloading that so that I could buy pills offline on the dark web.

[Girlfriend]: What kind of pills?

[Domenech]: Uh, there—there was one that I was taking called Modafinil.

[Girlfriend]: What's that for?

[Domenech]: It's—uh, it's—a stay-awake . . .

[Girlfriend]: Oh.

[Domenech]: . . . agent, it's—promotes wakefulness, basically.

[Girlfriend]: I thought it (unintelligible) . . .

[Domenech]: And that's how it was first day—you know, that's how I first—you know, I—I had gotten a prescription.  You had asked about the Cialis.  I had gotten a prescription for Cialis, um, before when I was with ([my ex]), and it w—it's—it was exceedingly expensive.  So I also went on the dark web to find Cialis to purchase for a lot cheaper.

[Girlfriend]: So how did—how does that work?  Like, you don't have to go see a doctor, you can just order it and they don't need to see . . .

[Domenech]: Right.

[Girlfriend]: . . . you or anything?  Oh.

[Domenech]: Right.

[Girlfriend]: 'Cause they sent you, like—so like, what I'm upset about is like, it's a whole big bottle of it.  And like, I thought that our relationship was at a place where, like, you would tell me that you needed something like that.  And

8

that's why seeing all this stuff makes me feel so inadequate that I'm not enough. And now I feel like any time we've been intimate, you've taken—you know, you've been taking something or—I—I don't know.

[Domenech]: Baby, you are 100 percent enough. You are a hundred percent enough, I swear to God.

[Girlfriend]: Would you feel bad if you found that I needed extra help or something?

[Domenech]: I mean, I might feel bad at first, but it's not, you know—it's not anything to do with you, it's just sometimes that, you know, it takes me longer. It takes me longer to get an erection as the older—older that I've gotten, you know, and I don't know if it's something with my body, or—and so that makes me feel inadequate, and I don't ever wanna—I don't ever want to not be able to perform when we're together.

[Girlfriend]: Hmm. Relax. Okay, so you're telling me when—so when you're looking at these young girls, are you able to get the erection easier.

[Domenech]: No, I mean, not any easier than a—you know.

[Girlfriend]: But it still arouses you.

[Domenech]: It arouses me because I know that it's forbidden fruit, basically, you know.

[Girlfriend]: And all of . . .

[Domenech]: It's like when I look at something taboo, sometimes, you know, if I see some fuckin' fake fuckin' porn that says, fuckin', you know, mother-son or fuckin' sister-sister or whatever, you know, it's just—it's just forbidden fuckin' aspect of it.

[Girlfriend]: Okay. Okay. Okay, okay. Okay. Take a . . .

[Domenech]: I just want—I just want to say sorry, and I just want, you know, I just want to be open and honest with you, and I'm sorry that I haven't been—I haven't been that to you about ch—about who I am and, like . . .

[Girlfriend]: I appreciate you being honest. I know it's not easy to talk about this, but I—I need, you know, I just needed to understand so that I can, you know, like, I'm—I'm just

trying to understand.  So none of the young girls are on your phone.  All . . .

[Domenech]: No.

[Girlfriend]: All of that and on just the computer?

[Domenech]: Correct.

[Girlfriend]: And—and you don't even want to guess at the age of the girls, but her—. . .

[Domenech]: I mean, I would imagine they're like around, you know, [child's name redacted] or [child's name redacted]'s age, you know?

[Girlfriend]: So 11, 13?

[Domenech]: Yeah.  10 to—10 to 16.  10 to 17, you know?

[Girlfriend]: I mean, I feel like there's a couple that looked younger than that.  But . . .

[Domenech]: Have you been—I wasn't lying earlier when I said, "You shouldn't be opening those pictures on an unsecured laptop, baby."

[Girlfriend]: Okay.  Don't worry.  Don't worry, okay.  Nothing.  I—I mean, I've only seen a few things.  I don't even know where everything is, and I—I don't even know like, I'm kinda scared of what else I'm going to find, so.  What are you afraid of me finding?

[Domenech]: Um, nothing.  I mean, I was afraid of you just finding out fuckin'—I was just afraid of you just finding out, it's scary.  You know?  It's just—I'm not that person.  I'm not that person.  You know?

[Girlfriend]: Okay.  Yeah, just breathe.  Just breathe.  So your—I mean, can you—can you just be honest?  Pl—please, just be honest.  I just—I just wanna—I just need to know— just, when was the last time you—you looked?  And I—I know you're saying it varies time to time, but . . .

[Domenech]: It's been—it's probably been more than—it's probably been more than five months.  I mean, I couldn't tell you exactly, but it's been a long time.

[Girlfriend]: Okay.  And like, you don't want me to open these videos, like, what are they doing in these videos?

10

[Domenech]: Nothing.  I mean, you know, typically sex or something, you know, or sometimes it's just girls dancing around and . . .

[Girlfriend]: So is it—is it adult male with a young . . .

[Domenech]: Some of them, some of them are adult male with a young girl.  Some of 'em are, you know, um, two younger people.

[Girlfriend]: Yeah.  Okay.  Okay.  I don—didn't you like, used to let, like [child's name redacted] and [child's name redacted], like play on your computer?

[Domenech]: No.

[Girlfriend]: Oh, okay.  I thought they used to like watch videos on your laptop and stuff.  Just was curious how you, you know, you would have kept them from seeing.  I just—I, you know, I just like I said, I've been kind of processing all these questions.  You know, you've been, you know, things that you've been saying, and I'm just trying to process it all, and I'm trying . . .

[Domenech]: I just need another chance with you, baby.  I promise—I promise I will never let you down again.

(Ellipses in original.)

After the controlled call, the detective requested a search warrant for Mr. Domenech's laptop and the attached USB drive for evidence that he violated section 827.071(5), Florida Statutes (2021).  In the affidavit for the warrant, the detective, as he later admitted, did not include a "word-for-word" recitation of what Mr. Domenech said during the controlled call.  Rather, the detective purported to summarize the content of Mr. Domenech's statements throughout the controlled call in a single, eight sentence paragraph:

On December 28, 2020, [Mr. Domenech's girlfriend], along with Clearwater Police Detectives, conducted a controlled call with DOMENECH regarding the laptop and the files contained therein.  Your affiant listened to the audio of the controlled call and observed that DOMENECH confessed he had been

11

downloading various photographs and videos from the dark web utilizing a Tor Browser, to include images and videos of child pornography. He stated that the images and videos were of adults engaging in sexual activity with what he described as "young children", children engaging in sexual activity with other children, and children in solo performance, all between the ages of 10–13. Your affiant observed that he further stated he believed the children in the images and videos to be young, and knew it was forbidden, but that was what compelled him [to] continue watching and downloading the material. DOMENECH said he knew it was wrong but felt he could not stop. DOMENECH was forthcoming in the controlled call about his possession of the images he knew were of underage girls engaging in sexual conduct, and that the images and videos were on the laptop. DOMENECH stated he never engaged in any inappropriate conduct with [his girlfriend]'s daughter, but has been engaging in viewing child pornography ever since he was exposed to it in college. He stated the worst time was when he separated from his ex-wife, and before he engaged in a relationship with [his girlfriend].

A circuit court judge issued a search warrant for Mr. Domenech's laptop and the attached USB drive. Law enforcement searched the laptop and USB drive, allegedly discovering "over 1,200 notable images" and "20 videos" that, according to the detective's sworn witness affidavit, "meet the criteria for identification as Child Pornography per Florida Statute." Thereafter, the State filed an information charging Mr. Domenech with 20 counts of Possession, Control, or Intentional Viewing of Child Pornography in violation of sections 827.071(5) and 775.0847, Florida Statutes (2021).

Mr. Domenech filed a motion to suppress the images and videos found on his laptop and thumb drive pursuant to *Franks v. Delaware,* arguing that the detective's search warrant affidavit contained "material omissions, intentional false statements and statements made in reckless disregard for the truth." Mr. Domenech specifically challenged the

12

following six sentences from the detective's eight-sentence description of the controlled call as false, either in whole or in part:

- "Your affiant listened to the audio of the controlled call and observed that DOMENECH confessed he had been downloading various photographs and videos from the dark web utilizing a Tor Browser, to include images and videos of child pornography."

- "He stated that the images and videos were of adults engaging in sexual activity with what he described as 'young children', children engaging in sexual activity with other children, and children in solo performance, all between the ages of 10–13."

- "Your affiant observed that he further stated he believed the children in the images and videos to be young, and knew it was forbidden, but that was what compelled him [to] continue watching and downloading the material."

- "DOMENECH said he knew it was wrong but felt he could not stop."

- "DOMENECH was forthcoming in the controlled call about his possession of the images he knew were of underage girls engaging in sexual conduct, and that the images and videos were on the laptop."

- "DOMENECH stated he never engaged in any inappropriate conduct with [his girlfriend]'s daughter, but has been engaging in viewing child pornography ever since he was exposed to it in college."

The trial court determined that a *Franks* hearing was necessary and scheduled an evidentiary hearing that occurred on September 6, 2022.

The detective was the sole witness at the *Franks* hearing. He conceded that he did not write a "word-for-word" account of the controlled call in his affidavit but rather provided "a summary of the totality of the investigation." He testified that he summarized the call because "[s]earch warrants aren't typically written word-for-word" and "[i]t would just be cumbersome" to do so.

13

The detective repeatedly admitted that many of the words and phrases in his affidavit were not specifically stated by Mr. Domenech during the controlled call, at times describing his linguistic choices as "a mistake" or that he should have been "more specific" in clarifying that he was providing a summary as opposed to what Mr. Domenech "stated." As one example, the detective admitted that Mr. Domenech never used the term "child pornography" during the controlled call, which appears in the second sentence of the affidavit's description of the call, but that Mr. Domenech's statements during the call were "discussing what *would be* child pornography." (Emphasis added.). Therefore, the detective testified that he believed his affidavit still accurately reflected the totality of Mr. Domenech's statements made during the controlled call.

The trial court announced its conclusion that all of the challenged portions of the detective's affidavit were false statements made in reckless disregard for the truth. And because the trial court further concluded that everything in the affidavit that would constitute probable cause was false, the trial court granted Mr. Domenech's motion to suppress.

## Analysis

The State contends on appeal that the trial court erred by holding a *Franks* hearing and by its subsequent "[e]xclusion of the multitude of files containing child pornography on [Mr. Domenech]'s laptop and USB drive." "Suppression orders enjoy a presumption of correctness," and we review the trial court's factual findings for competent substantial evidence and its legal determinations de novo. *S.P. v. State*, 331 So. 3d 883, 887 (Fla. 2d DCA 2022); *see Pileci v. State*, 991 So. 2d 883, 894 (Fla. 2d DCA 2008).

14

In *Franks v. Delaware*, the U.S. Supreme Court created a limited, two-step form of review for defendants to challenge deliberate or reckless misstatements in probable cause affidavits:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and if the allegedly false statement is necessary to the finding of probable cause*, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155–56 (emphasis added); *see also Johnson v. State*, 660 So. 2d 648, 655 (Fla. 1995); *Conley v. State*, 226 So. 3d 358, 360 (Fla. 2d DCA 2017).

There were false statements in the affidavit supporting the warrant in this case. While taking pains to clarify that it was not finding the affiant's conduct to have been "malicious" or even "intentional," the trial court found that this was an "egregious" and "clear-cut case where the affidavit is inaccurate," for which there could be "no explanation" for the affiant's conduct other than a "reckless disregard" for the truth. The record supports the trial court's conclusion in that regard. However, under *Franks*, a defendant is required to establish both that the inclusion of the statements exceeded mere negligence such that it constituted perjury or reckless disregard for the truth *and* that the false statements were material such that without them there would be no probable cause. *See Franks*, 438 U.S. at 155–56.

15

In this case the affidavit was replete with falsehoods pointed out by the defendant, but they fell along a spectrum—from those easily attributable to innocent negligence to those so irresponsible they are at least susceptible to the charge of intentionality; and from those that are immaterial to the probable cause determination to those with an undeniable propensity to influence a magistrate's probable cause determination. On one end of the spectrum was the detective's specific statement that Mr. Domenech "utilize[ed] a Tor Browser" to download child pornography from the "dark web." Mr. Domenech said nothing about a Tor browser on the controlled call, but, according to the detective, Mr. Domenech *did* mention a Tor browser in another conversation with his girlfriend. It is at least arguable that the detective accidentally and perhaps recklessly conflated the two conversations to mistakenly identify the Tor browser as the putative means of downloading the alleged child pornography even though Mr. Domenech made it clear in the controlled call that it was *other* items he acquired by downloading "applications" to access the "dark web." *See id.* at 171 ("Allegations of negligence or innocent mistake are insufficient."). However, *how* Mr. Domenech allegedly *obtained* child pornography— whether through a Tor browser or some other means—is immaterial to evaluating whether there is probable cause that he actually *possessed* child pornography. So, regardless of whether that factual anomaly met the *Franks* standard of "reckless disregard for the truth," it cannot be said it was "necessary to the finding of probable cause." *Id.* at 156–57.

On the other end of the spectrum was the detective's characterization that Mr. Domenech "*confessed* he had been downloading various photographs and videos from the dark web utilizing a Tor Browser, to include *images and videos of child pornography*."

16

(Emphasis added.). Mr. Domenech's statements on the controlled call and reasonable inferences therefrom could be honestly characterized as indicating that he and his girlfriend were likely "discussing what would be child pornography," as the detective explained during the hearing. However, the detective's affidavit itself went further than that; by recounting that Mr. Domenech had *confessed* to downloading *child pornography*, the affiant was conveying that he had obtained a suspect's confession to the crime being investigated. What was heard on the call does not comport with the ordinary meaning of a confession to a crime. *See, e.g.*, *Burks v. State*, 613 So. 2d 441, 443 n.3 (Fla. 1993) (describing a "confession" as a "statement made by a defendant disclosing his guilt of crime with which he is charged and excluding possibility of a reasonable inference to the contrary" (quoting *Burks v. State*, 589 So. 2d 355, 357 (Fla. 5th DCA 1991))); *Burks*, 589 So. 2d at 357 ("A confession leaves nothing to be determined, in that it is a declaration of his . . . intentional participation in a criminal act." (quoting *People v. Beverly*, 43 Cal. Rptr. 743, 750 (Cal. Ct. App. 1965)); *cf. Davis v. State*, 582 So. 2d 695, 700 (Fla. 1st DCA 1991) ("distinguish[ing] 'confessions,' which are complete acknowledgments of a criminal act, from 'admissions,' which are statements from which guilt may be inferred" (citing *Nelson v. State*, 372 So. 2d 949, 950–51 (Fla. 2d DCA 1979))). In light of the potential effect that an affiant's assertion that such a confession was obtained by law enforcement would likely have on a magistrate's probable cause determination, inclusion of such an inaccurate assertion in a warrant affidavit constitutes a reckless disregard for the truth. *See Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) ("An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had

17

obvious reasons to doubt the accuracy of the information he reported.' " (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995))).

However, despite that there were false statements manifesting a reckless disregard for the truth—some of which, such as the assertion of a *confession*, could be considered material insofar as they would support in the mind of a magistrate that probable cause existed—we need not analyze every statement in detail to parse all of the accuracies from falsehoods, or dissect and piece back together a Frankenstein-like version of the affidavit, in order to agree with the State that the trial court erred by excluding "the multitude of files containing child pornography on [Mr. Domenech]'s laptop and USB drive." That is because as to at least one of the six challenged statements there is no competent substantial evidence supporting the trial court's finding that it is false. And even if we presume that the other five statements are false and remove them from the affidavit, what remains is still sufficient to establish probable cause for the search. *See Johnson*, 660 So. 2d at 655 ("The materiality prong of *Franks* requires the moving party to establish that the affidavit, *with the misstatements deleted*, would itself fail to establish probable cause.").

There is no competent substantial evidence to support the trial court's attribution of falsity to the following statement in the affidavit: "DOMENECH was forthcoming in the controlled call about his possession of the images he knew were of underage girls engaging in sexual conduct, and that the images and videos were on the laptop." The truth of that statement is founded within the following portion of the controlled call:

> [Girlfriend]: I appreciate you being honest. I know it's not
> easy to talk about this, but I—I need, you know, I just needed
> to understand so that I can, you know, like, I'm—I'm just

18

trying to understand. *So none of the young girls are on your phone. All . . .*

[Domenech]: *No.*

[Girlfriend]: *All of that and on just the computer?*

[Domenech]: *Correct.*

[Girlfriend]: And—and you don't even want to guess at the age of the girls, but her—. . .

[Domenech]: *I mean, I would imagine they're like around, you know, [child's name redacted] or [child's name redacted]'s age, you know?*

[Girlfriend]: So 11, 13?

[Domenech]: Yeah. 10 to—10 to 16. *10 to 17, you know?*

[Girlfriend]: I mean, I feel like there's a couple that looked younger than that. But . . .

[Domenech]: Have you been—I wasn't lying earlier when I said, "*You shouldn't be opening those pictures on an unsecured laptop*, baby."

[Girlfriend]: Okay. Don't worry. Don't worry, okay. Nothing. I—I mean, I've only seen a few things. I don't even know where everything is, and I—I don't even know like, I'm kinda scared of what else I'm going to find, so. What are you afraid of me finding?

[Domenech]: Um, nothing. I mean, I was afraid of you just finding out fuckin'—I was just afraid of you just finding out, it's scary. You know? It's just—I'm not that person. I'm not that person. You know?

[Girlfriend]: Okay. Yeah, just breathe. Just breathe. So your—I mean, can you—can you just be honest? Pl—please, just be honest. I just—I just wanna—I just need to know— just, when was the last time you—you looked? And I—I know you're saying it varies time to time, but . . .

[Domenech]: It's been—it's probably been more than—it's probably been more than five months. I mean, I couldn't tell you exactly, but it's been a long time.

[Girlfriend]: Okay. And like, you don't want me to open these videos, like, *what are they doing in these videos*?

19

[Domenech]: Nothing.  I mean, you know, *typically sex or something*, you know, or sometimes it's just girls dancing around and . . .

[Girlfriend]: So is it—is it adult male with a young . . .

[Domenech]: Some of them, *some of them are adult male with a young girl.  Some of 'em are, you know, um, two younger people.*

(Ellipses in original.) (Emphasis added.).

While not a word-for-word recitation, the detective's statement is faithful to what Mr. Domenech said on the controlled call.  Mr. Domenech's provision of substantive answers to his girlfriend's questions supported the detective's description that he was "forthcoming"; Mr. Domenech's reference to "pictures" and his response to his girlfriend's question about "videos" supported the detective's use of the words "images and videos"; Mr. Domenech confirmed that the pictures and videos were on his "computer," which he also referred to as an "unsecured laptop"; Mr. Domenech's answers regarding the "young girls" and "younger people" as being between the ages of "10 to 17" supported the detective's use of the phrase "underage girls," *see* § 827.01(2) (" 'Child' means any person under the age of 18 years."); and that Mr. Domenech's description of what the young girls were "doing" included "sex" in at least some of the videos supported the detective's use of the phrase "sexual conduct," *see* § 827.071(1)(h) (" 'Sexual conduct' means actual or simulated sexual intercourse . . . .").

The trial court reasoned that the detective's statement was false because it considered the statement to be a "quote from the controlled call" of something Mr. Domenech never expressly said and specifically pointed out that Mr. Domenech "never said sexual conduct."  While the trial court is correct that Mr. Domenech did not utter the precise phrase "sexual conduct," Mr. Domenech plainly referred to some of the young

20

girls engaging in "sex," and the implication that the use of "sexual conduct" was a reckless misrepresentation of "sex" defies common sense. *See id.*; *State v. Loredo*, 129 So. 3d 1188, 1192 (Fla. 2d DCA 2014) ("Affidavits should be considered in their entirety and read in a common-sense manner."). To the contrary, logic suggests that the latter is subsumed within the former. To conclude otherwise would require the reader to accept the unreasonable conclusion that engaging in "sex" is not "sexual conduct." Moreover, nothing in that particular statement from the detective's affidavit reflects that he was attempting to quote Mr. Domenech. The statement describes Mr. Domenech's communication not as an utterance of precise words or the making of a confession but rather as having been "forthcoming" about the facts described in the statement.

Even if we presume for the sake of analysis that each of the other five statements that Mr. Domenech challenged meet the *Franks* standard for excision—some of which undoubtedly do—we conclude that what remains in the affidavit is still sufficient to establish probable cause. *Franks*, 438 U.S. at 155–56; *Johnson*, 660 So. 2d at 65. Probable cause is determined "by examination of the four corners of the affidavit," *Pagan v. State*, 830 So. 2d 792, 806 (Fla. 2002), and exists when, "given all the circumstances set forth in the affidavit before [the magistrate], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Sanchez v. State*, 141 So. 3d 1281, 1284–85 (Fla. 2d DCA 2014) ("[A] supporting affidavit for issuance of a search warrant 'must satisfy two elements: first, that a particular person has committed a crime—the commission element, and second, that evidence relevant to

21

the probable criminality is likely located at the place to be searched—the nexus element.' " (quoting *Burnett v. State*, 848 So. 2d 1170, 1173 (Fla. 2d DCA 2003))).

Excising the other five statements for the sake of analysis without reaching a determination as to their falsity, the paragraph in the detective's affidavit detailing the controlled call would read as follows:

> On December 28, 2020, [Mr. Domenech's girlfriend], along with Clearwater Police Detectives, conducted a controlled call with Domenech regarding the laptop and the files contained therein. DOMENECH was forthcoming in the controlled call about his possession of the images he knew were of underage girls engaging in sexual conduct, and that the images and videos were on the laptop.

That description establishes a "fair probability" of finding evidence on Mr. Domenech's laptop that he violated section 827.071(5). *See Gates*, 462 U.S. at 238; *see also* § 827.071(5)(a) ("It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation which, in whole or in part, he or she knows to include any sexual conduct by a child.").

The trial court deduced that, in light of other provisions of the affidavit that give a sense that the detective is directly quoting Mr. Domenech, a reader would also consider that remaining statement to be a part of what was essentially a transcript of the controlled call. To the contrary, the contrast between other portions of the affidavit such as those indicating what Mr. Domenech allegedly "stated" and the portion describing that about which Domenech had been "forthcoming" tends to strengthen the sense that the latter was summarizing what was heard as opposed to quoting it. More importantly, the trial court's reasoning is not consistent with the framework laid out in the *Franks* opinion, which

22

requires the analyzing court to "set to one side" the "false material" before determining whether the "remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156. Doing so in this case supports the conclusion that the unoffending statement is on its own supportive of a determination that probable cause existed. Without the other statements, the revised affidavit describes a conversation between the girlfriend and Mr. Domenech, monitored by police detectives, wherein Mr. Domenech acknowledges he has possession of images and videos on a laptop of underage girls engaging in sexual conduct.

While the temptation to advance the prophylactic purpose of the exclusionary rule by disincentivizing heedless and irresponsible law enforcement conduct may be understandable, in this case the falsities in the affidavit do not negate a finding of probable cause. *See, e.g.*, *Harder v. Edwards*, 174 So. 3d 524, 532 (Fla. 4th DCA 2015) ("We do not condone the detective's misrepresentations in securing the warrant. However, after removing the falsehoods from Harder's affidavit and analyzing what remains under the Fourth Amendment, we hold that there was probable cause to support Edwards's arrest."); *Murray v. State*, 155 So. 3d 1210, 1217, 1219 (Fla. 4th DCA 2015) (noting that "a reviewing court's finding that the police acted in a deceptive manner will not, by itself, result in automatic suppression," and affirming the trial court's denial of a motion to suppress because, in part, the detective's affidavit still established probable cause even after excising an admittedly untrue statement). The detective's affidavit accurately described the portion of the controlled call in which Mr. Domenech made statements establishing a fair probability that he committed a crime and that evidence of that crime was located on his laptop computer. Accordingly, we reverse the trial court's order suppressing the evidence

stemming from the search of Mr. Domenech's computer and remand for further proceedings.

Reversed and remanded.

LaROSE, J., Concurs.
LABRIT, J., Concurs in result only.

_____

Opinion subject to revision prior to official publication.